**BOATING INDUSTRY ASSOCIATIONS, a general partnership, National Association of Engine and Boat Manufacturers, a New York Corporation, Northern California Marine Association, a California Corporation, Earl and Robert Cooper, d/b/a Driftwood Marine, a partnership, Sailnetics, a sole proprietorship, and Easom Boat Works, Inc., a California Corporation, Plaintiffs-Appellees,**

**v.**

**Ray MARSHALL, United States Secretary of Labor, Donald Elisburg, Assistant Secretary of Labor for Employment Standards, and Everett P. Jennings, Acting Director, Office of Workers' Compensation Programs, United States Department of Labor, Defendants-Appellants.**

**No. 78–1827.**

United States Court of Appeals, Ninth Circuit.

Aug. 13, 1979.

Joshua T. Gillelan, II, Washington, D. C., for plaintiffs-appellees.

Robert H. Koehler, Washington, D. C., for defendants-appellants.

Before WALLACE and SNEED, Circuit Judges, and BLUMENFELD,* District Judge.

SNEED, Circuit Judge:

Appellants, defendants below, appeal from a summary judgment declaring certain amendatory provisions of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.,* inapplicable to recreational boat builders and marinas and directing appellants to rescind a notice and memorandum expressing a contrary view. Appellees, plaintiffs below, sought judicial review, pursuant to 5 U.S.C. § 701 *et seq.,* of a certain "ruling," more fully described below, and the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202. Because we have concluded that the appellees did not have standing to challenge the notice and that their attack on the appellants' interpreta-

---

* Honorable M. Joseph Blumenfeld, Senior United States District Judge for the District of Connecticut, sitting by designation.

tion of the LHWCA is not ripe for adjudication, we reverse.

## I. BACKGROUND

This action began with a complaint filed November 12, 1976. Named as plaintiffs were the Boating Industry Associations and the National Association of Engine and Boat Manufacturers (two recreational boating-industry associations), the Northern California Marine Association (a recreational boating-industry regional trade association), and three Northern California businesses within that same industry (a marine operator and two boat yards). Hereinafter all are collectively referred to as "boating associations." Named defendants included the Secretary of Labor, the Assistant Secretary of Labor for Employment Standards, and the Director of the Department of Labor's Office of Workers' Compensation Programs.

The "ruling" in question resulted directly from efforts initiated by the two boating associations in response to 1972 changes made by Congress in the LHWCA. Prior to 1972, entitlement to compensation benefits under the LHWCA was limited to individuals who sustained injuries while actually upon the navigable waters of the United States. The 1972 amendments, among other changes, expanded the geographical scope of coverage to include injuries sustained in certain specified land areas adjoining navigable waters.[1] But Congress at the same time amended the Act so as to limit covered individuals to those persons engaged in maritime employment:

> The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker . . .

33 U.S.C. § 902(3).

The LHWCA requires employers whose employees are engaged in "maritime employment" to secure the payment of compensation provided for by the Act either through insurance or by proof of financial ability to act as a self-insurer.[2] Section 938 specifies that failure to secure the payment of compensation constitutes a misdemeanor punishable by a fine of $1000 or imprisonment for one year. Officers of corporate employers who fail to secure payment are jointly and severally liable for compensation or other benefits which may accrue under the Act. In addition, section 930 of the Act requires employers to report to the Secretary any injury or death under the Act's coverage. Failure to do so subjects an offending employer to a civil penalty not to exceed $500 per violation. 33 U.S.C. § 930(e).

Shortly after the 1972 amendments to the LHWCA became effective, the Department of Labor, on January 26, 1973, issued implementing regulations governing the administration and procedures applicable under the

---

1. Section 3(a) of the LHWCA, 33 U.S.C. § 903(a), as amended, provides in pertinent part:

   Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

2. 33 U.S.C. § 932(a) requires covered employers to secure payment:

   (1) By insuring and keeping insured the payment of such compensation with any stock company or mutual company or association, or with any other person or fund, while such person or fund is authorized (A) under the laws of the United States or of any State, to insure workmen's compensation, and (B) by the Secretary, to insure payment of compensation under this chapter; or
   (2) By furnishing satisfactory proof to the Secretary of his financial ability to pay such compensation and receiving an authorization from the Secretary to pay such compensation directly. . . . Any employer securing compensation in accordance with the provisions of this paragraph shall be known as a self-insurer.

   Regulations issued by the Secretary of Labor require a minimum security deposit of $100,000 in the form of either an indemnity bond or negotiable securities before authority will be granted for an employer to become a self-insurer under section 932(a)(2).

Act. These regulations did not specify whether workers in the recreational boating industry were "maritime employees" under the Act. On May 15, 1973, the boating associations requested "administrative interpretation and guidance" from the Department of Labor Employment Standards Administration as to the applicability of the 1972 amendments to recreational boat manufacturers and marinas and boat yards in which recreational boats are berthed and serviced. The request stated the associations' view that the Act should not apply to these persons. The request concluded by stating:

> However, in view of the inconclusiveness of the Act's language and legislative history as to this issue and in view of the general conclusion which exists in our industry relative to these matters, we deem it prudent to seek *official guidance*. Accordingly, we respectfully request the Department's *advice* as to the correctness of the foregoing conclusions.

Court Transcript (CT) at 15 (emphasis added).

After substantial waiting, on February 19, 1974 the associations wrote the Undersecretary of Labor a letter which stated that a "speedy resolution of . . . our request for a definitive interpretation of the coverage of the '72 amendments would allow assessment of the proper rates for the required insurance coverage." CT at 18. More than a year later, April 21, 1975, the Associate Solicitor for Employee Benefits responded to the associations' request. The letter stated that "we are of the view that the Longshoremen's Act is applicable to recreational boat builders and marinas." CT at 29. The letter enclosed a memorandum setting forth the department's position. Thereafter, on June 6, 1975, the Office of Workers' Compensation Programs (OWCP) issued a Notice No. 21 entitled "Notice to Insurance Carriers, Self-Insured Employers Under the Longshoremen's Compensation Act and Other Interested Parties." The notice stated its purpose was to inform interested parties of the OWCP's "position" with regard to coverage of recreational boat builders and marinas. CT at 38. The notice concluded that "recreational boat builders and marinas are subject to the provisions of the Act, except in certain instances . . . outlined in this notice."[3] *Id.* The OWCP distributed Notice No. 21 to "[w]orkers' compensation departments and field representatives who service . . . claims under the . . . Act." CT at 41. The notice was signed by the Director of the Office of Workers' Compensation Programs.

In their complaint, the boating associations asserted that the ruling issued by the OWCP forced association members to obtain insurance coverage or assume the risk of enforcement actions under section 38 for failure to do so. Additionally, the complaint claimed that members were subject to sanctions under section 30 for failure to file required accident reports. The additional operating expense entailed in obtaining LHWCA coverage, rather than less expensive state workmen's compensation coverage, allegedly forced one of appellees, a marina, to terminate its employees.

By way of a remedy, appellees requested first a declaration that they and their members were not subject to the LHWCA. In addition, the boating associations requested that the court (1) declare the appellants' ruling incorrect, (2) order appellants to rescind the ruling, and (3) issue a ruling that the provisions of the LHWCA do not apply to recreational boat manufacturers, boat repair facilities, or marinas.

On cross-motions for summary judgment, the district court on January 31, 1978 granted judgment in favor of the boating associations. Its February 16, 1978 judgment declared:

> [T]o the extent they are engaged in building or repairing recreational boats or op-

---

**3.** The notice summarized its conclusions:

We have thus concluded that recreational boat builders and marinas are "employers" within the meaning of section 2(4) of the Longshoremen's and Harbor Workers' Compensation Act. We recognize that there are cases where employees of these employers may not be covered under the provisions of the Act. These cases must be resolved on a case-by-case basis thru the adjudicatory process.

CT at 41.

erating recreational boat marinas, plaintiffs and their members are not subject to the [LHWCA].

CT at 395. The appellants were directed to rescind the legal memorandum and Notice No. 21, and the judgment further provided that:

The aforementioned rescission shall clearly state that: (a) it is "done pursuant to the 31 January 1978 order of the United States District Court for the Northern District of California in *Boating Industry Associations, et al. v. Marshall, et al.,* C–76–2550 RHS"; (b) it is no longer the official position of the Labor Department that the Longshoremen's and Harborworkers' Compensation Act applies to recreational boat builders and marinas.

CT at 395–96.

## II. STANDING

### A. *The Elements of Standing*

■ Our analysis of the standing of the appellees to bring this suit begins with the proposition that to challenge government action in federal court, a plaintiff must have been "injured in fact." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). This requirement differentiates a person with a direct stake in the actual outcome of the particular litigation, however small that stake may be, from a person merely concerned with the legal issues raised. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The latter has no standing.

■ Standing serves both as a constitutional limitation on judicial power, deriving from the "case or controversy" requirement in Article III for exercise of the federal judicial power, and as a self-imposed discretionary doctrine intended to monitor judicial review of public acts. *See* C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure: Jurisdiction* § 3531, at 54 (Supp.1979). In *Bowker v. Morton,* 541 F.2d 1347 (9th Cir. 1976), we capsulized the standing requirement derived from Supreme Court precedents as follows:

[T]he test for standing . . . is that the plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought.

541 F.2d at 1349. Thus, standing requires that the injury of which a plaintiff complains derives from the action challenged. The necessary corollary of this requirement is that the federal court be able to provide redress through the remedy sought.[4] It follows that if the injury stems not from the government action disputed, but from an independent source, a federal court cannot provide the plaintiff redress by directing the government to alter its action. The plaintiff, under such circumstances, lacks standing to challenge the particular government action.

Support for *Bowker* exists in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), in which the Supreme Court noted that "the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." 426 U.S. at 41–42, 96 S.Ct. at 1926. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Court found that the minimum Article III requirements had not been met in *Simon*; the Court stated that "[s]pe-

---

4. The interrelationship between these two concepts was acknowledged in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). The Court upheld plaintiffs' standing to challenge Nuclear Regulatory Commission action. After finding that the plaintiffs had established injury in fact, the Court stated:

The more difficult step in the standing inquiry is establishing that these injuries "fairly can be traced to the challenged action of the defendant," . . . or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries. 438 U.S. at 74, 98 S.Ct. at 2631 (Citation omitted).

culative inferences are necessary to connect [the plaintiffs'] injury to the challenged actions of petitioners." 426 U.S. at 45, 96 S.Ct. at 1927. "Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire." 426 U.S. at 45–46, 96 S.Ct. at 1927–1928.

More recently, the Supreme Court in *Gladstone Realtors v. Village of Bellwood*, —— U.S. ——, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), repeated its analysis while upholding the standing of plaintiffs to challenge racial steering practices.

> The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury *as a result of the putatively illegal conduct* of the defendant. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 71, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 260–261, 97 S.Ct. 555, 560–561, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Warth v. Seldin, supra*, 422 U.S. at 499, 95 S.Ct. at 2205; *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Otherwise, the exercise of federal jurisdiction "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Org., supra*, 426 U.S. at 38, 96 S.Ct. at 1924.

99 S.Ct. at 1608 (emphasis added). The Court summarized the Article III minima for standing as follows: "A plaintiff must always have suffered 'a distinct and palpable injury to himself,' . . . that is likely to be redressed if the requested relief is granted." *Id.* (citations omitted). With these standards in mind, we now turn to the specifics of this case.

## B. *The Elements of Standing Applied*

The district court found that the appellees-plaintiffs had standing to challenge the ruling by relying on *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–54, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The district court characterized the injury inflicted:

> [I]f plaintiffs and their members comply with the ruling, they incur considerable expense in connection with maintaining insurance under the LHWCA. On the other hand, the ruling indicates that if plaintiffs and their members choose to avoid the expense, the Labor Department may seek criminal penalties against them. Furthermore if a claim for compensation under the LHWCA is filed against the plaintiffs or their members, the presence of the Labor Department ruling would tend to make it more likely that the compensation claim would be successful.

CT at 392.

### 1. *The Injury*

We are prepared to assume, for the purposes of this appeal, that the appellees have incurred a present economic detriment. Marina operators and recreational boat manufacturers must cover the risk of liability, whatever that might be, through insurance. This added cost, and perhaps the diminished business flowing therefrom, constitute a very real economic loss. The boating association members also are subject to a risk of prosecution if they fail to insure. We reject, however, the contention that these derive from the Notice No. 21 issued over the signature of Director of the OWCP. If this be true, it follows that we cannot remedy the injury in this action.[5]

---

**5.** Standing usually is determined to exist or not on the basis of adequately pleaded allegations. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP), supra*, 412 U.S. at 688–90, 93 S.Ct. 2405. On summary judgment, however, this court must review the affidavits submitted to support the allegation of injury flowing from the action sought to be reviewed. Therefore we must decide if any issue of fact as to the source of injury and remediability exists. This is not one of those cases in which "it . . . remains to be seen

### 2. The Source of the Injury and Effectiveness of Remedy

The source of the plaintiffs' injury is the LHWCA. Its enactment subjects the plaintiffs to the risk that it will be interpreted by those charged with adjudicating compensation claims in the manner indicated by Notice No. 21. The revocation of Notice No. 21 would not eliminate this risk nor is it eliminated by the district court's decree. Neither the Secretary of Labor nor the OWCP can dictate to the Benefits Review Board the manner in which the LHWCA should be interpreted. It, therefore, follows that no effective remedy is possible in an action of this kind.

Our conclusion has its roots in the structure of the LHWCA. When Congress amended the LHWCA, it created statutory duties affecting employers of maritime employees. These included the duty to secure the payment of compensation and the duty to report certain occurrences to the Secretary. The Act provides that the Secretary "shall, upon request, provide persons covered by this chapter with information and assistance relating to the chapter's coverage . . . ." 33 U.S.C. § 939(c)(1). But the Act also sets out a normal claims process to be initiated by injured employees. The process includes appeal through the Benefits Review Board and review in a court of appeals. 33 U.S.C. § 921. It is this process that in the final analysis yields an interpretation that either injures or benefits the appellees. Neither the OWCP nor the Secretary determines the outcome of this process. Notice No. 21 is not a "substantive rule" implementing a coverage provision.[6] Claims for compensation still must emanate from injured individual covered employees. Had the OWCP stated a conclusion contrary to that of Notice No. 21, employers would continue to need insurance to cover the risk that the OWCP interpretation of the statute was incorrect.[7]

Nor has Notice No. 21 increased the prosecution threat of which the appellees complain. OWCP has not threatened to prosecute the boating association members. It issued an interpretation of the statute, under which, if ultimately sustained, members

---

whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Gladstone Realtors v. Village of Bellwood, supra*, 99 S.Ct. at 1616 n. 31.

**6.** The Administrative Procedure Act (APA) provides review for any person "suffering legal wrong *because of* agency action, or adversely affected or aggrieved *by* agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702 (emphasis added). The APA distinguishes between agency regulations that are "substantive rules" and those that are "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b), (d). *See Chrysler Corp. v. Brown*, —— U.S. ——, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979).

Legislative, or substantive, regulations are "issued by an agency pursuant to statutory authority and . . . implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission . . . . Such rules have the force and effect of law."
*Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977), *quoting* U.S. Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947). Substantive rules, unlike interpretive regulations, must be afforded notice and proposed rulemaking under 5

U.S.C. § 553(b). *Chrysler Corp. v. Brown, supra*, 99 S.Ct. at 1723–24.

Notice No. 21 is not a regulation issued under congressional mandate in assistance of the OWCP's regulatory powers. Rather, this ruling derives from the requirement that the Secretary provide "information and assistance" when requested. 33 U.S.C. § 939(c)(1). This section should not be expanded into a congressional mandate for pre-enforcement review of any of the Act's provisions for which assistance is requested. The Supreme Court recognizes that "a court is not required to give effect to an interpretive regulation," *Chrysler Corp. v. Brown, supra*, 99 S.Ct. at 1724; *Batterton v. Francis, supra*, 432 U.S. at 425 n. 9, 97 S.Ct. 2399, nor, in our view, is the Benefits Review Board.

**7.** The request for a ruling from the Secretary appears to have been generated by a desire to have lower insurance rates. Presumably a favorable ruling could be used to convince insurers and their authorities to establish "correct" rates. Remedy for this injury would depend upon actions of third parties not before the court in this action. The interpretation by the OWCP in this instance did not directly affect the third parties. *See Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 41–42, 96 S.Ct. 1917.

might be subject to prosecution. A contrary interpretation would not have insulated recreational boat manufacturers from later prosecution were the interpretation rejected.[8] We do not deny that from a practical standpoint Notice No. 21 constitutes a significant straw in the wind. It is an interpretation arrived at after an extended study that is contrary to the contentions of the appellees. Its appearance changes to some degree the likelihood that it will prevail ultimately. The District of Columbia Court of Appeals, in denying review to an interpretive provision of the Federal Maritime Commission, succinctly stated the effect of similar action:

> Whatever practical or psychological effect this rule may have on the conduct of petitioners,—and we do not doubt that it may have some pragmatic consequences—its legal effect is essentially that of an opinion of the legal staff. Neither the affected parties nor the courts are bound by it unless they elect to adopt it as a correct interpretation of the statute.

*American President Lines, Ltd. v. Federal Maritime Commission,* 114 U.S.App.D.C. 418, 421, 316 F.2d 419, 422 (D.C.Cir., 1963).

### 3. *The Authorities*

The shift in the odds against the appellees' interpretation caused by Notice No. 21 is not enough to confer standing. Our position, we believe, is supported by Professor Davis in his analysis of four major Supreme Court cases preceding *Gladstone Realtors,* *supra,* that reflect upon standing analysis: *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); and *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). He observed:

> "The principle" of the four cases might well be that when proof of causal relationship between governmental action and injury to a plaintiff is difficult or impossible, the court should make a judgment as to whether the causal relation is probable enough to allow standing.

K. Davis, *Administrative Law Treatise* § 22.20 at 196 (Supp.1978). In this case we find the requisite causal relation not "probable enough."

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), on which appellees rely heavily, is distinguishable. In *Abbott Laboratories,* the Commissioner of Food and Drugs issued an interpretive regulation under the authority of the Secretary of Health, Education & Welfare implementing a 1962 statutory amendment. The Court upheld pre-enforcement review on the basis that the regulation exceeded the authority given by the statute. The Court concluded that "the regulation is directed at them in particular: *it requires them to make significant changes* in their everyday business practices; *if they fail to*

---

**8.** The Director of the OWCP gave his opinion on a matter of statutory construction. His opinion is not entitled to great weight. The Third Circuit propounded two reasons for this in *Director, Office of Workers' Compensation Programs v. O'Keefe,* 545 F.2d 337, 343 (3d Cir. 1976).

> Based upon our reading of the statute, we conclude that neither the Director of the Office of Workmen's Compensation Programs nor the Benefits Review Board is entitled to "great deference" in the interpretation of the 1972 amendments. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). First, neither the Director nor the Board is the officer or agency charged with the administration of the statute. While the Director is authorized by Congress to administer the statute he does not resolve disputed legal issues involving the LHWCA. Substantial questions of law arising in an adversarial context are specifically reserved for decision first by administrative law judges and then by the Board. . . .
>
> Second, the task of statutory construction is one of discerning "the intent of the legislature." *United States v. Papercraft Corp.,* 540 F.2d 131, at 136 (3d Cir. 1976). Neither the Director nor the Board possesses or has exercised any special expertise in this endeavor. The analysis of each is based solely upon the text of the amendments and the legislative history. We are thus faced with a question of law over which this Court has always exercised plenary, *de novo* review. *See Western Union Telegraph Co. v. FCC,* 541 F.2d 346, 356–357 (3d Cir. 1976) (Garth, J., dissenting).

*observe the Commissioner's rule* they are quite clearly exposed to the imposition of strong sanctions." 387 U.S. at 154, 87 S.Ct. at 1518 (emphasis added). Here the impact of Notice No. 21 is much more attenuated. To compare an unfavorable change in the odds against prevailing ultimately with the almost irresistible pressure to change the daily practice of drug manufacturers in *Abbott Laboratories* is to compare a warning shift in the wind to the full force of a hurricane. The elements of standing permit such distinctions to be drawn.

Our decision finds precedent in *Plumas County Board of Supervisors v. Califano*, 594 F.2d 756 (9th Cir. 1979), and, of course, *Bowker v. Morton*, 541 F.2d 1347 (9th Cir. 1976). In *Plumas* we agreed with the district court "that Plumas County cannot claim to be aggrieved by the receipt of federal assistance . . . ." 594 F.2d at 760. Because invalidating the HEW regulation at issue would not relieve the county of a state-created obligation to pay, we held that no standing existed. The county may have been injured, but not by the challenged regulation. In *Bowker*, we also noted that the remedy to the injury claimed would not follow from the relief requested.

> In sum, these allegations not only fail to set forth a particularized injury resulting from the defendants' action, but also fail to show that the injury . . . will be redressed by the available remedy sought.

541 F.2d at 1350.

### 4. *Ripeness*

To repeat, the appellee's injury has its source in the 1972 amendments to the LHWCA. Appellees, however, do not challenge the constitutionality of those amendments, nor is it clear that standing to make such a challenge would exist. For example, standing to challenge the constitutionality of an apparently applicable criminal statute has been denied in several cases. *See, e.g., Bailey v. Patterson*, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); *Rincon Band of Mission Indians v. County of San Diego*, 495 F.2d 1 (9th Cir.), *cert. denied*, 419 U.S. 1008, 1022, 95 S.Ct. 328, 495, 42 L.Ed.2d 283, 295 (1974).

The mere existence of the statutes does not suffice to create a "case or controversy" within the meaning of Article III. . . . Since appellants presented only the possibility of their prosecution for violation of the regulation, they have failed to establish the existence of a "case or controversy."

*Jensen v. National Marine Fisheries Service (NOAA)*, 512 F.2d 1189, 1191 (9th Cir. 1975), *citing United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

At this point the appropriate conventional characterization of the issue becomes that of ripeness rather than standing. Thus, had appellees sought a declaratory judgment to fix their view of the meaning of the 1972 amendments as they applied to their business, our task would have been to determine whether their dispute with the Secretary was ripe for resolution. A federal court may not issue a declaratory judgment unless " 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Lake Carriers' Association v. MacMullen*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed. 257 (1972). We believe review on these facts would be premature. The injury of which the appellees complain reaches full term only when the review process established by the Act becomes fully engaged. The Supreme Court has stated that "the declaratory judgment procedure will not be used to preempt and prejudge issues that are committed for initial decision to an administrative body or special tribunal . . . ." *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 246, 73 S.Ct. 236, 241, 97 L.Ed. 291 (1952). *See*, C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2763. Although the existence of an alternative remedy does not preclude a declaratory judgment action, in this case we believe it appropriate to await the more fully developed factual record emanating from the Benefits Review Board consideration of what is "maritime employment."

### 5. Conclusion

The appellees, of course, face a difficult choice whether to insure or not, but the choice is not unlike that forged by many regulatory statutes with criminal sanctions. Moreover, the possibility of criminal sanctions applying does not of itself create a case or controversy. *See Rincon Band of Mission Indians v. County of San Diego, supra,* 495 F.2d 1; *Daley v. Weinberger,* 400 F.Supp. 1288 (E.D.N.Y. 1975), *aff'd* 536 F.2d 519 (2d Cir. 1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977). We conclude that the appellees lack standing to challenge Notice No. 21 and any effort to put in issue the proper interpretation of the Act is not ripe for decision. Therefore, the district court erred. We reverse and remand to the district court.

REVERSED AND REMANDED.