723 F.2d 1440
 20 ERC 1591, 86 A.L.R.Fed. 237, 14
Envtl. L. Rep. 20,328
 HAWAIIAN ELECTRIC COMPANY, INC., Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
American Lung Association of Hawaii, the Sierra Club, Joseph
M. Singer, & the League of Woman Voters of Hawaii,
Intervenors-Respondents.
 No. 83-7259.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 17, 1983.
Decided Jan. 20, 1984.
 
 William Frick, Lathrop, Koontz, Righter, Clagett & Norquist, Washington, D.C., for petitioner.
 Jay M. Fidell, Bendet, Fidell & Sakai, Honolulu, Hawaii, Charles D. Ossola, Hunton & Williams, Washington, D.C., amicus curiae.
 David Earl Dearing, Sara Schneeberg, E.P.A., Washington, D.C., for respondent.
 Joseph Brecher, Oakland, Cal., for intervenors-respondents.
 Petition for review of an action of the Environmental Protection Agency.
 Before TIMBERS*, GOODWIN and SCHROEDER, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 Hawaiian Electric Company, Inc. (HECO) seeks review of an EPA determination not to proceed with consideration of modifying PSD permit HI 78-02 until HECO complies with the procedure for permit revision applying to major modifications. HECO's appeal is timely under 42 U.S.C. Sec. 7607(b) (Clean Air Act). We affirm EPA's determination and hold that all other issues raised are not ripe for review.
 
 
 2
 HECO's Kahe power plant is Oahu's greatest source of sulfur dioxide emissions. In 1978 it consisted of five oil-fired units, all built before 1975, with a total capacity of about 500 megawatts. In 1978 HECO burned 2% sulfur oil. Unit 6, a new 146 megawatt oil-fired unit, began operation in November 1980.
 
 
 3
 EPA issued Prevention of Significant Deterioration (PSD) Permit HI 78-02 to HECO on January 26, 1979. EPA issues PSD permits in Hawaii because the state does not have an EPA approved PSD permit program as part of its State Implementation Plan (SIP), 42 U.S.C. Sec. 7410; 40 C.F.R. Sec. 51.18. To allow operation of Unit 6, the PSD permit required that the existing units reduce emissions by shifting to 0.5% sulfur oil. When Unit 6 began operation, all six units began burning the 0.5% oil.
 
 
 4
 A PSD permit was required because in 1978 EPA designated the surrounding area as not able to be classified for compliance with National Ambient Air Quality Standards (NAAQS) for sulfur dioxide (40 C.F.R. 81.312 (1978)).[1] The use of 0.5% sulfur oil was required because a wind tunnel dispersion model indicated that higher sulfur content would not meet NAAQS. After the use of 0.5% oil began, HECO determined by a mathematical model that the wind tunnel analysis was inadequate. EPA refused to accept HECO's conclusions, but as a result of further discussions, HECO established a seven-station monitoring network. Based on results at the end of one year of monitoring (completed on March 15, 1983), HECO concluded that Units 1-5 could burn higher sulfur fuel without violating NAAQS.[2] On March 18, 1983, HECO submitted the information to EPA and petitioned for reconsideration of the PSD permit requirement that Units 1-5 use 0.5% sulfur fuel.
 
 
 5
 In its March 25, 1983, response EPA stated:
 
 
 6
 Our preliminary review of the new information submitted by HECO confirms that HECO would be able to increase the fuel sulfur content at Units 1-5 without adversely affecting air quality.
 
 
 7
 However, EPA went on to state that under 40 C.F.R. Sec. 52.21(b)(2)(iii)(e)(1) of its PSD regulations, the change in fuel would be a "major modification" requiring a new PSD permit for Units 1-5.
 
 
 8
 To obtain a PSD permit for Units 1-5, additional data would have to be submitted. 42 U.S.C. Sec. 7475; 40 C.F.R. Sec. 52.21(j)-(p). In the March 25, 1983, letter EPA specified that the additional data required were an analysis of Best Available Control Technology (BACT) and an "additional impacts analysis" (dealing with potential impairment to visibility, soils, and vegetation). Additionally, BACT would have to be employed on Units 1-5. 42 U.S.C. Sec. 7475(a)(4); 40 C.F.R. Sec. 52.21(j)(2). There is a strong possibility that BACT for Units 1-5 would be identical to that already required for Unit 6, i.e., 0.5% sulfur oil. As part of BACT, control of other pollutants such as particulate matter could also be required. 40 C.F.R. Sec. 52.21(j)(3).
 
 I. Final Action
 
 9
 A. Application of major modification definition
 
 
 10
 EPA has determined that HECO's proposed change to higher sulfur fuel is a major modification, and has refused to consider HECO's petition until further information is submitted. We have jurisdiction if this action is "any other final action" within the meaning of 42 U.S.C. 7607(b)(1).
 
 
 11
 Harrison v. PPG Industries, Inc., 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980), provides some guidance as to the scope of these words. At issue in Harrison was whether a facility was subject to a New Source Performance Standard. As in this case, the record for review consisted of an exchange of letters. The Court noted,
 
 
 12
 "It is undisputed that the Administrator's ruling represented EPA's final determination concerning the applicability of the 'new source' standards to PPG's power facility. Short of an enforcement action, EPA has rendered its last word on the matter. The controversy thus is not about whether the Administrator's decision was 'final,' but rather about whether it was 'any other final action' within the meaning of Sec. 307(b)(1), as amended in 1977." 446 U.S. at 586, 100 S.Ct. at 1894. (Emphasis in original.)
 
 
 13
 The Court went on to conclude that the words "any other final action" are to be taken literally because of the scant legislative history on point. With regard to the list in 40 U.S.C. Sec. 7607(b)(1) of other kinds of final action, the Court held that the rule of statutory interpretation ejusdem generis was inapplicable because the Court discerned no uncertainty in the meaning of the words "any other final action." Id. at 588-589, 100 S.Ct. at 1895-96.
 
 
 14
 Under the Court's reasoning, EPA's position that its application of the major modification definition is included within the meaning of "any other final action" seems correct. Its classification of the fuel switch as a major modification represents EPA's final statement on the legal issues, and no future event will aid the court's consideration. In addition, concerning the applicability as a matter of law of the major modification definition, there is no problem of adequacy of the record for review. Cf. Amvac Chemical Corp. v. EPA, 653 F.2d 1260 (9th Cir.1980). And finally, although the application of the major modification definition is an interim step in the PSD permitting process, it has immediate legal consequences, i.e., the requirement of PSD review. See Western Oil & Gas v. EPA, 633 F.2d 803, 807-808 (9th Cir.1980).
 
 
 15
 In sum, the criteria on which we rely to determine whether we may review an EPA action pursuant to 42 U.S.C. Sec. 7607(b)(1) are: (1) that the action be final in the sense of being definitive, (2) that the record be developed to a point adequate for review, and (3) that the action have sufficient immediate impact on an interest of the party seeking review. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); Toilet Goods Assn. v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) and Gardner v. Toilet Goods Assn., 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). If these criteria are met, then the issue is ripe for review.
 
 
 16
 These criteria are consistent with those employed in Roosevelt Campobello Intern. Park v. EPA, 684 F.2d 1034, 1039-1040 (1st Cir.1982). In that case, the Pittston Company was blocked from building an oil refinery in northern Maine under 1978 PSD regulations. The issues that the court determined to be not ripe for judicial review involved a challenge to a PSD permit issued to the Pittston Company under 1975 regulations. The permit under the 1975 regulations would be pertinent if, as EPA had proposed, EPA modified its rules so that the 1975 rather than the 1978 regulations became applicable to Pittston.
 
 
 17
 The court gave several reasons for finding lack of ripeness. Passing on the issue would involve reviewing a lengthy, technical record and resolving difficult legal questions in a hypothetical context. Further, there was other litigation pending that could effect EPA's determinations. And finally, Pittston would not be harmed by the court's withholding review because it was merely blocked from building until EPA changed its rules, rather than being required to undertake any affirmative action to comply with EPA determinations.
 
 
 18
 Applying the three criteria listed above for assessing reviewability to the facts of the instant case yields a different result than in Roosevelt. First, the requirement of PSD review via the procedure for major modifications is definitive and there is no other pending litigation. This is in contrast to the uncertainty in Roosevelt about which set of regulations would ultimately apply. Second, the legal issues are simple and the record is straightforward. Third, unlike Pittston, HECO currently has an affirmative obligation imposed upon it, i.e., to use relatively more expensive low sulfur fuel. To alter that obligation, given EPA's determination of the applicability of the major modification provision, it must take additional affirmative actions in terms of supplying information, and it is potentially subject to even more stringent affirmative obligations through the BACT provisions. Moreover, the instant proceeding is the only feasible route available to HECO to achieve modification of the requirements presently imposed on it. These factors together mean that there is a much more immediate impact on HECO's interest than there was on Pittston's interest in Roosevelt.
 
 
 19
 Intervenors American Lung Association, et al., argue that there is insufficiently immediate impact on an interest of HECO because the Kahe plant is within an area designated as nonattainment for sulfur dioxide. If the Kahe area continues to be subject to the requirements of Part D of the Clean Air Act, dealing with nonattainment, rather than Part C, dealing with PSD, a different kind of permit will be required to allow a fuel switch.[3] It appears very unlikely that such a permit could be obtained. EPA indicated to HECO in 1981 that as long as the Kahe area remains nonattainment, Part D of the Act would apply. EPA further indicated that since the State of Hawaii does not have an acceptable new source review procedure, the Kahe area is covered by the construction moratorium implemented by 40 C.F.R. Sec. 52.24. See 42 U.S.C. Sec. 7410(a)(2)(I); Connecticut Fund for Environment v. E.P.A., 672 F.2d 998 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982). Until the State of Hawaii establishes a new source review procedure, it is unlikely that the construction moratorium will be lifted. Id. Cf. e.g., 48 Fed.Reg. 50,686 (1983).
 
 
 20
 It thus appears that for any change to be foreseeable in the air pollution controls required at the Kahe plant, the Kahe area must be redesignated attainment and HECO's request for a change in its PSD permit must be granted. Indeed, the State of Hawaii has requested EPA to redesignate the area as attainment. And, EPA may be able to do so after complying with the Administrative Procedure Act. Western Oil & Gas v. EPA, 633 F.2d 803 (9th Cir.1980). That the two decisions are intimately connected is emphasized by the fact that the nonattainment designation applies only to the area immediately surrounding the Kahe plant. See 40 C.F.R. Sec. 81.312 (1982). In these circumstances EPA's determination of the applicability of PSD review has sufficient immediate impact on HECO's interest in the air pollution controls imposed on it to satisfy the third prong of our ripeness test.
 
 
 21
 The burden imposed on HECO of complying with the more rigorous major modification review, combined with the likelihood of substantially more stringent controls if in fact such review is applied, distinguishes this case from Roosevelt, as already discussed, and also from Boating Industry Associations v. Marshall, 601 F.2d 1376 (9th Cir.1979). In Boating Industry we refused to grant relief from one administrative determination when there was an independent determination still to be made. The first administrative determination was a letter from the Department of Labor advising that it believed certain provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 901 et seq., were applicable to plaintiffs. The plaintiffs' insurance premiums were thereby raised. The letter, however, had no legal force, and the applicability of the provisions to plaintiffs remained a completely open question until the Benefits Review Board could answer it by passing on the definition of "maritime employment." What distinguishes Boating Industry from HECO's predicament is that the Department of Labor did not have the authority ultimately to resolve the plaintiffs' problem. Any decision by the Benefits Review Board would in fact be completely independent of the Department's position. In this case EPA has indicated to HECO the sole circumstances under which it will reconsider HECO's permit i.e., major modification review. If HECO may not challenge EPA's determination now, then this is "a case in which withholding review may force a party, as a practical matter, to comply with an agency ruling that it believes unlawful...." Roosevelt, 684 F.2d at 1040. Although, as discussed below, intermediate actions are reviewable only on review of the final agency action, we have concluded that application of the major modification definition is a final action and that it is appropriate for us to review that action precisely in order to avoid forcing HECO to comply with a ruling it believes unlawful.
 
 B. The PSD permit[4]
 
 22
 i. Reconsideration of the permit
 
 
 23
 Consistent with the criteria for reviewability outlined above, EPA's refusal to modify the present PSD permit until further information is submitted is not final action under 42 U.S.C. Sec. 7607(b)(1).[5] EPA's March 25, 1983, letter, insofar as it refused to immediately modify the permit, is a "preliminary, procedural, or intermediate agency action," which is "not directly reviewable," but rather "subject to review on the review of the final agency action." 5 U.S.C. Sec. 704 (Administrative Procedure Act). In the March 25 letter EPA requested additional information in order to complete consideration of the petition. Because there has been no final action on the merits of the petition, the controversy is not fit for judicial resolution.
 
 
 24
 We have stated that "[j]udicial intervention in uncompleted administrative proceedings, absent a statutory mandate is strongly disfavored." Bakersfield City Sch. Dist. of Kern Cty. v. Boyer, 610 F.2d 621, 626 (9th Cir.1979). See Abbott, Toilet Goods and Gardner, supra. Review of the merits of the air pollution control demanded of HECO, which is what review of the PSD permit involves, would entangle the court in an uncompleted administrative action whose ultimate resolution will depend on contested factual issues of a technical nature.
 
 
 25
 Intervenors American Lung Association, et al., have raised some of these issues. They assert that HECO's calculations are based on actual emissions from the Kahe plant when operating at far less than full capacity. They assert its calculations were based on data selected to minimize the likelihood of predicting violations and that data from locations showing greater pollution concentrations have not been fully provided to EPA. They also argue that because 42 U.S.C. Sec. 7423(a)(1) states that polluters should not be given credit for smokestacks higher than good engineering practice, adjustments must be made to the monitoring results. They further argue that more monitoring is required. These contentions combined with EPA's request for more data from HECO indicate numerous factual disputes which an appellate court is ill prepared to assess without the more developed record that will exist following administrative determination of these issues. Oljato Chapter of Navajo Tribe v. Train, 515 F.2d 654, 665 (D.C.Cir.1975).
 
 
 26
 HECO's alleged financial hardship from having to continue to use the relatively more expensive low sulfur oil and from having to complete its petition for reconsideration is insufficient to outweigh the inappropriateness of the issues for judicial resolution. "[P]ossible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action." Abbott, 387 U.S. at 153, 87 S.Ct. at 1517.
 
 
 27
 ii. Validity of the original permit
 
 
 28
 HECO argues that it is challenging the premises under which the permit was originally granted and that therefore application of the major modification definition in particular and PSD review in general is incorrect. The policy of finality, which is critical to the administration of a complex technocratic program, dictates that HECO's argument must fail. Finality is a particularly important value in air pollution control because of the simultaneous existence of substantial risk and substantial technical uncertainty.
 
 
 29
 HECO's challenge to the original permit is clearly untimely; in addition to our application of the provisions on timeliness, however, we also discuss two of HECO's policy arguments to illustrate the appropriateness of not allowing the original permit to be challenged.
 
 
 30
 a. Time limit
 
 
 31
 Review of final actions of the Administrator must be sought within 60 days of notice of such action in the Federal Register. 42 U.S.C. Sec. 7607(b)(1). EPA took final action establishing PSD permit HI 78-02 on January 25, 1979. Although EPA did not immediately publish notice of this action in the Federal Register, HECO had actual notice of the 0.5% sulfur oil condition as of the date of final action. EPA did publish a proposed delayed compliance order in the Federal Register on January 8, 1982, that included notice of PSD permit HI 78-02. 47 Fed.Reg. 969 (1982). Time for original review of the permit therefore expired at the latest on March 9, 1982. Since HECO did not file its petition for review until April 20, 1983, we do not have jurisdiction to review the permit as originally issued.
 
 
 32
 b. Modeling
 
 
 33
 HECO's petition for reconsideration essentially depends on its assertion that the modeling which justified the original imposition of the permit was flawed.
 
 
 34
 Congress' concern about modeling science led it to require EPA to establish uniform modeling techniques for use in PSD permitting and to review and update those models periodically as modeling science developed. See 42 U.S.C. Secs. 7475(e)(3)(D) and 7620. EPA did develop modeling guidelines, 40 C.F.R. 52.21(1), and they were subsequently upheld on judicial review. Alabama Power Co. v. Costle, 636 F.2d 323, (D.C.Cir.1979). The courts have recognized the need for agency discretion in applying the results of modeling. Wisconsin Electric Power Co. v. Costle, 715 F.2d 323 at 330-31 (7th Cir.1983) (EPA is justified in preferring monitoring to modeling in determining whether emissions in a given area would violate NAAQS); Citizens Against Refinery's Effects v. EPA, 643 F.2d 178, 183 (4th Cir.1981) ("The deference normally given administrative agencies in interpreting their own regulations as well as the highly technical nature of the modeling techniques make the EPA particularly well suited to make determinations as to whether to issue a PSD permit or not."). See also Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc., --- U.S. ----, ----, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983) (reviewing court must be at its most deferential when reviewing predictions of an expert agency).
 
 
 35
 Nothing in the Clean Air Act or its legislative history indicates that Congress intended that EPA should have to reconsider each and every PSD permit if modeling predictions were subsequently drawn into question. In fact, Congress attempted to avoid excessive bureaucratic contention by requiring EPA to make a decision on all PSD permit applications within one year. 42 U.S.C. Sec. 7475(c). This effort would be frustrated if PSD permits could routinely be challenged de novo.
 
 
 36
 In addition, we have held that post-decision studies may not be used to challenge an agency decision absent a showing that such a decision was based on assumptions that "were entirely fictional or utterly without scientific support." Ass'n of Pac. Fisheries v. EPA, 615 F.2d 794, 812 (9th Cir.1980); accord, Wisconsin Electric Power Co. v. Costle, 715 F.2d 323 (7th Cir.1983). In this case, HECO concedes that the permit was reasonable when issued.
 
 
 37
 c. Policy challenge to PSD
 
 
 38
 HECO maintains that the 0.5% sulfur oil requirement was included in the original permit solely to achieve NAAQS. It argues that its request for reconsideration of the permit should therefore not involve PSD review. It argues that the Clean Air Act gives EPA no authority to require reductions in emissions from existing sources which are not being modified except if necessary to attain and maintain NAAQS. HECO, however, overlooks the point that the requirement was imposed on existing generators as a condition of approval to operate a new generator which would add to pollution emissions. Had the limitation not been imposed, both HECO and EPA agree that available information indicated NAAQS might have been violated for sulfur dioxide.
 
 HECO cites legislative history stating:
 
 39
 [N]o rollback in emissions from existing plants would be required under the provisions of this section, whether the area is designated Class I, Class II or Class III. H.R.Rep. No. 294, 95th Cong., 1st Sess. 152, reprinted in 1977 U.S.Code Cong. & Ad.News 1231. (Emphasis in original.)
 
 
 40
 This language, however, is in the context of a general discussion of baseline concentrations when areas are classified as Class I, Class II or Class III. It does not bar EPA from requiring HECO to reduce emissions from its existing generators as a condition for allowing operation of a new generator when such a condition is necessary to ensure that NAAQS and PSD increments are not violated, 42 U.S.C. Sec. 7475(a).
 
 
 41
 HECO also attempts to maintain that EPA may not impose emission restrictions that are more stringent than necessary to protect NAAQS. But HECO itself admits in its brief that the ultimate purpose of the PSD program is to maintain air quality better than NAAQS. Indeed, Congress repeatedly emphasized that NAAQS alone were insufficient to protect public health and welfare. For example, the Senate Report emphasized the "shortcomings and limitations" of the ambient standards--they do not provide an adequate margin of safety on health impacts; they are based on a false assumption that no-effects threshold levels exist; they do not adequately protect against genetic mutations, birth defects, cancer, or diseases caused by long-term chronic exposures or periodic short-term peak concentrations, and hazards due to derivative pollutants and to cumulative or synergistic impacts of various pollutants; and they do not adequately protect against crop damage and acid rain. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 105-132, reprinted in 1977 U.S.Code Cong. & Ad.News 1183-1211; see also Statement by Senator Muskie in A Legislative History of the Clean Air Act Amendments of 1977, 95th Cong., 2d Sess. No. 16 (1979), vol. 3, pp. 1032-1035. "The non-degradation amendment is intended to help reduce overall emissions and thus provide protection against these kinds of adverse impacts." Legislative History, supra, at 728.
 
 
 42
 In sum, Congress found that it was important to reduce pollution levels below those mandated by the standards and that the best means of doing so was to require the installation of BACT on all sources which would otherwise increase pollution. Therefore, it is absurd for HECO to maintain that EPA may not, through a PSD permit, require pollution controls which yield air quality better than NAAQS.
 
 
 43
 iii. Validity of the major modification regulation
 
 
 44
 HECO in effect challenges the validity as well as the application of 40 C.F.R. Sec. 52.21(b)(2)(iii)(e)(1).[6] Under 42 U.S.C. Sec. 7607(b)(1), "[a]ny petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register." This requirement has been upheld as a valid mechanism to prevent continual piecemeal attacks on the same EPA action. See City of Seabrook, Tex. v. EPA, 659 F.2d 1349, 1370 (5th Cir.1981), cert. denied, 459 U.S. 822, 103 S.Ct. 51, 74 L.Ed.2d 57 (1982).
 
 
 45
 The final 1980 PSD regulations were published in the Federal Register on August 7, 1980. 45 Fed.Reg. 52,676 (1980). Time for review of 40 C.F.R. 52.21(b)(2)(iii)(e)(1) has long expired.
 
 II. Major Modification
 
 46
 Considerable deference is afforded to an agency's interpretation of a statute it administers. Whirlpool Corp. v. Marshall, 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). We have held that when EPA is interpreting its own regulations, it is entitled to even more deference. Montana Power Co. v. EPA, 608 F.2d 334, 345 (9th Cir.1979).
 
 Title 40 C.F.R. 52.21(b)(2) provides:
 
 47
 (2)(i) "Major modification" means any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act.
 
 
 48
 * * *
 
 
 49
 (iii) A physical change or change in the method of operation shall not include:
 
 
 50
 * * *
 
 
 51
 (e) Use of an alternative fuel or raw material by a stationary source which:
 
 
 52
 (1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 C.F.R. 52.21 or under regulations approved pursuant to 40 C.F.R. 51.18 or 40 C.F.R. 51.24[.]
 
 
 53
 An increase in sulfur content of fuel constitutes a "major modification" under this definition if the increase (1) results in a significant net emissions increase and (2) amounts to a physical or operational change. HECO does not dispute that the increase it proposes would result in a significant net emissions increase. Rather, HECO argues that the increase would not be a physical or operational change. HECO is wrong.
 
 
 54
 The market recognizes 0.5% and 2% sulfur oil as different fuels with distinct prices. Also, EPA in the past has clearly distinguished the two fuels when, as in this case, there is a permit condition specifying the sulfur content of fuel. Although Units 1-5 were able to use 2% sulfur fuel before January 6, 1975, the sulfur content increase is prohibited by an enforceable permit condition established after January 6, 1975, pursuant to 40 C.F.R. 52.21. As a result, the proposed fuel switch does not fit within the fuel switching exemption from the definition of major modification contained in 40 C.F.R. Sec. 52.21(b)(2)(iii)(e)(1).
 
 
 55
 In one past instance, EPA explained the requirements of 40 C.F.R. 52.21(b)(2)(iii)(e)(1) as follows:
 
 
 56
 Concerning PSD applicability, a change in sulfur content of a fuel burned at a source (e.g. 1% sulfur oil to 2.2% sulfur oil) is not considered a modification and, therefore not subject to PSD permit procedures unless the content of the fuel is limited by an enforceable permit condition and/or the source is not physically capable of burning the higher sulfur fuel. Normally a source is physically capable of using a particular fuel without regard to the fuel's sulfur content and therefore, enforceable permit condition [sic] tend to be the more important concern when determining PSD applicability. (Emphasis added.) Internal EPA memo concerning Delmarva Edge Moor Station.
 
 
 57
 EPA points to its application of the PSD regulations in this manner in 1980 when the Arkansas Power and Light Company wished to increase the sulfur content of fuel at its Independence plant. Because the requested increase required a change in the company's PSD permit and would have resulted in a significant increase in sulfur dioxide emissions, EPA required the company to obtain a new PSD permit.
 
 
 58
 HECO advances only one instance in 1979 where EPA considered fuels of different sulfur content interchangeable. In that instance the generally applicable SIP limit on fuel sulfur content was the only existing restriction on the sulfur content of fuel burned at the facility involved. The facility did not have any specific permit limit on sulfur content of fuel. When EPA stated in that determination that an increase in sulfur content does not constitute use of an "alternative" fuel, it referred only to an increase at the facility involved in the determination and other similar facilities with no prior permit limit on sulfur content.
 
 
 59
 HECO and amici argue that the environmental benefit of using 0.5% sulfur oil is not worth the economic expense. This argument is untimely. Economic considerations are not relevant in determining whether a PSD permit is required. Economic considerations are only evaluated in determining the control level (BACT) required under PSD. See 40 C.F.R. 52.21(b)(12) (1982) and 42 U.S.C. Sec. 7479(3). Thus the economic issues are not yet ripe for review.
 
 
 60
 A policy reason for requiring PSD review, in addition to those discussed in preceding sections, is that subsequent PSD permits to other sources are premised on stability of the level of emissions from existing sources. 42 U.S.C. Secs. 7470-7479. The preamble to the 1980 PSD regulations stated that "[i]n EPA's view, any switch to another fuel or raw material that would distort a prior assessment of a source's air quality impact should have to undergo [PSD] scrutiny." 45 Fed.Reg. 52,676, 52,704 (1980). Such distortion is exactly the effect HECO's proposed fuel switch would have. EPA notes that other projects have in fact relied upon HECO's PSD permit in calculating their air quality impact for PSD purposes. The Hawaiian Independent Refinery, Inc., located on Oahu, received a PSD permit for several preheaters on June 25, 1980, and submitted an application for a permit for a hydrogen plant on January 25, 1981. The applications for both of these projects calculated available PSD increment in the Kahe area based upon use of no greater than 0.5% sulfur fuel at Kahe Units 1-5. Any emissions increase HECO makes will consume this available PSD increment.
 
 
 61
 Thus, based on a literal reading of the applicable regulation and on policy considerations, we affirm EPA's application of the "major modification" definition to HECO's proposed fuel switch. We decline to review all other issues.
 
 
 62
 Remanded to the Environmental Protection Agency for any further proceedings.
 
 
 
 *
 The Honorable William H. Timbers, Senior Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 In 1979 the area was reclassified as nonattainment for sulfur dioxide (40 C.F.R. Sec. 81.312 (1982))
 
 
 [2]
 HECO apparently argues that respect of PSD increments is not a relevant consideration
 
 
 [3]
 For a permit under Part D, HECO would be required to obtain emission offsets (42 U.S.C. Sec. 7503(1)(A)) and to comply with the lowest achievable emission rate (42 U.S.C. Sec. 7503(2)). The "lowest achievable emission rate" is the most stringent emission rate contained in any state implementation plan or the most stringent emission limitation achieved in practice. 42 U.S.C. Sec. 7501(3)
 
 
 [4]
 Intervenors American Lung Association, et al., suggest that HECO should appeal to the district court under Oljato Chapter of Navajo Tribe v. Train, 515 F.2d 654, 667 n. 20 (D.C.Cir.1975), if it feels that EPA has failed to respond to its petition. In such case the district court would have the power to order a complete response. However, there is no question that EPA's letter of March 25, 1983, is an adequate response to HECO's petition
 
 
 [5]
 Indeed, intervenors American Lung Association, et al., point to continuing correspondence between EPA and HECO during July and August 1983 in which HECO conceded there were additional data which might indicate the sulfur content requirement could not be fully relaxed
 
 
 [6]
 Amici Alabama Power Co., et al., argue that EPA must rescind the PSD permit pursuant to 40 C.F.R. 52.21(w)(3). That provision provides for automatic rescission of PSD permits imposed pursuant to the provisions of the 1978 PSD regulations found invalid in Alabama Power Co. v. Costle, 636 F.2d 323 (D.C.Cir.1979). The scope of 40 C.F.R. 52.21(w)(3) is made quite clear by the preamble to its initial proposal, 44 Fed.Reg. 51921, 51927 (1979). Since the PSD permit was not imposed pursuant to the provisions held invalid, amici's argument has no merit