# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1007 |

| | |
|---|---|
| COMPLETE TITLE: | Container Life Cycle Management, LLC, Petitioner-Appellant-Petitioner, v. Wisconsin Department of Natural Resources, Respondent-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 397 Wis. 2d 242, 959 N.W.2d 76
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 23, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 6, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Stephanie Rothstein |

JUSTICES:

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioner-appellant-petitioner, there were briefs filed by *David M. Lucey, Linda E. Benfield, Peter A. Tomasi, Anne-Louise T. Mittal,* and *Foley & Lardner LLP,* Milwaukee. There was an oral argument by *David M. Lucey.*

For the respondent-respondent, there was a brief filed by *Gabe Johnson-Karp*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Gabe Johnson-Karp*.

An amicus curiae brief was filed by *Scott E. Rosenow* and *WMC Litigation Center*, Madison, for Wisconsin Manufacturers & Commerce, Inc.

**2022 WI 45**

No. 2019AP1007
(L.C. No. 2019CV313)

| STATE OF WISCONSIN | : | IN SUPREME COURT |

Container Life Cycle Management, LLC,

      Petitioner-Appellant-Petitioner,

  v.

Wisconsin Department of Natural Resources,

      Respondent-Respondent.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 23, 2022**

Sheila T. Reiff
Clerk of Supreme Court

---

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. The petitioner, Container Life Cycle Management, LLC (CLCM), seeks review of a per curiam decision of the court of appeals affirming the circuit court's dismissal of its petition for judicial review of two letters issued by the Department of Natural Resources (DNR) in December

of 2018.[1] The court of appeals determined that the letters at issue were not final agency decisions subject to judicial review.

¶2 CLCM argues that the December 14 letter[2] adversely affects its substantial interests and is subject to judicial review regardless of whether it constitutes a "final" decision of DNR. Further, CLCM contends that even if there is a "finality" requirement for judicial review pursuant to Wis. Stat. § 227.52 (2019-20),[3] the December 14 letter is sufficiently final to warrant judicial review. In response, DNR asserts that the December 14 letter does not affect CLCM's substantial interests and that CLCM's petition for judicial review is an untimely attempt to seek review of an earlier letter.

¶3 For the reasons set forth below, we conclude that the December 14 letter does not adversely affect CLCM's substantial interests. As a result, the letter is not subject to judicial review and the circuit court properly dismissed CLCM's petition.

¶4 Accordingly, we affirm the decision of the court of appeals.

---

[1] Container Life Cycle Mgmt., LLC v. DNR, No. 2019AP1007, unpublished slip op. (Wis. Ct. App. Mar. 30, 2021) (per curiam) (affirming order of the circuit court for Milwaukee County, Stephanie Rothstein, Judge).

[2] Although CLCM initially sought judicial review of two letters, dated December 14 and December 26, its argument in this court focuses on the December 14 letter only.

[3] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

I

¶5 CLCM is engaged in the business of refurbishing used chemical containers. At its facility in St. Francis, it receives and cleans industrial containers such as steel and plastic drums. The St. Francis facility is a source of air emissions subject to DNR's regulation.

¶6 Understanding the factual background of this case requires a short foray into the governing law and the terminology it creates. DNR regulates CLCM through the issuance of air permits under the federal Clean Air Act,[4] Wisconsin's analogous air pollution statutes,[5] and related DNR regulations[6] regarding emissions of air contaminants from stationary sources.[7]

¶7 The applicable statutes recognize two main categories of stationary sources, major sources and minor sources. A major source is one that is capable of emitting a greater amount of contaminants than the law permits, and a minor source is a stationary source that is not a major source.[8] As relevant here, regulations also recognize a "synthetic minor source," which is

---

[4] 42 U.S.C. § 7401 et seq.

[5] Wis. Stat. ch. 285.

[6] Wis. Admin. Code chs. NR 405 (July 2016) and NR 406 (Sept. 2020).

[7] A "stationary source" is "any facility, building, structure or installation that directly or indirectly emits or may emit an air contaminant only from a fixed location." Wis. Stat. § 285.01(41).

[8] Wis. Stat. § 285.01(24), (25).

3

a source that has the capability to emit more contaminants than permitted by law, but accepts permit conditions that keep its emissions below the major source level.[9]

¶8 Generally, a construction permit is required to construct a new emissions source or modify an existing source.[10] In areas of the country with relatively good air quality, the permitting framework centers on the prevention of significant deterioration of air quality, referred to as "PSD."[11] Major sources are subject to PSD requirements, which means that specifications in a construction permit must be based on maximum pollution control achievable with the best available pollution control technology, or "BACT."[12]

¶9 In 2017, both DNR and the United States Environmental Protection Agency notified CLCM of a violation of an air permit it had been issued in 2014. The source of the violation was odors and air emissions from the St. Francis facility. Seeking to remedy the violation, in February 2018, CLCM sought a permit

---

[9] Wis. Admin. Code § NR 407.02(9) (Feb. 2022).

[10] See Wis. Stat. § 285.60(1)(a)1.

[11] Both regulators and those in the industry use a variety of acronyms. For ease of reference, we set forth the relevant acronyms:

PSD: Prevention of significant deterioration

BACT: Best available control technology

VOC: Volatile organic compound

[12] See Sierra Club v. DNR, 2007 WI App 181, ¶2, 304 Wis. 2d 614, 736 N.W.2d 918.

to install a regenerative thermal oxidizer as a means of controlling odors and emissions.  DNR responded that it needed additional information.

¶10  On June 7, 2018, CLCM submitted a revised construction permit application.  In addition to the regenerative thermal oxidizer, the revised application sought the installation of a new emissions source, removal of existing equipment, and the revision of existing permit emission limits.  CLCM requested a "commence construction waiver" for the regenerative thermal oxidizer and new emissions source that would allow construction to begin before the permit was issued.

¶11  DNR responded to the revised application with a letter dated June 26, 2018.  In the June letter, DNR denied the commence construction waiver on the basis that "the facility is a PSD major source" and stated that it "may not grant a waiver" for such a source.  The June letter also stated that previous projects undertaken at CLCM's facility should have been subject to PSD permitting and that the facility required "an after-the-fact PSD permit to address . . . emissions not previously disclosed."  Additionally, the June letter stated that the revised application was incomplete and requested that CLCM address several issues to finish the application.

¶12  Among the several issues, the June letter stated:

> Because the facility is a major PSD source of [volatile organic compounds (VOCs)], it is important to allocate the total VOC emissions to each emission unit to understand, for each unit, the applicability of permitting under ch. NR 405, Wis. Adm. Code. Please provide maximum theoretical and potential VOC

5

emission calculations for each significant unit at the facility . . . .

In addition, for the units subject to major-source review, "the facility will be expected to provide additional information in support of a BACT determination, as applicable."

¶13 The June letter also observed that the "revised construction permit application indicates the facility would like to be a synthetic minor for VOC emissions." DNR expressed concern "that the nature of the operations at the facility do not allow for practical enforceability" of the proposed limitation that would make CLCM's facility a synthetic minor source. Accordingly, DNR asked CLCM to "[p]lease explain how the facility can demonstrate compliance with this limitation."

¶14 Finally, the June letter indicated that it was "not a complete review of the . . . construction permit application request or the operation permit application submitted at the same time." However, it contained a notice of appeal rights and applicable deadlines, stating: "If you believe that you have a right to challenge this construction waiver decision, you should know that Wisconsin statutes establish time periods within which requests to review Department decisions must be filed." As relevant here, the letter set forth: "For judicial review of a decision pursuant to §§ 227.52 and 227.53, Wis. Stats., you have 30 days after the decision is mailed, or otherwise served by the Department, to file your petition with the appropriate circuit court and serve the petition on the Department . . . ."

6

¶15 CLCM neither petitioned for judicial review of the June letter, nor did it provide all of the additional information DNR requested. Rather, CLCM submitted revised calculations and technical memoranda in an attempt to demonstrate that its facility was not a major source.

¶16 DNR responded to CLCM's revised calculations with a letter dated December 14, 2018. According to the December 14 letter, DNR still considered CLCM's application to be incomplete. It also explicitly stated that it disagreed with CLCM's assertions that the facility was not a major source and that it was not subject to an after-the-fact PSD permit. DNR "once more" requested that CLCM submit BACT analyses.

¶17 Additionally, the December 14 letter raised the issue of CLCM's request to be considered a synthetic minor source. It set forth:

> [T]he department has determined that such a permitting approach is not approvable in an after-the-fact PSD situation. In accordance with long-standing US EPA and department policy, DNR cannot issue a construction permit for existing equipment for which a facility failed to obtain a PSD permit without placing BACT or BACT-equivalent controls on the equipment in question.

¶18 The December 14 letter then listed emissions units subject to BACT review, stating that DNR "requests again that CLCM provide[] additional information for the units identified . . . as well as any other modified or new emissions units that are sources of VOC emissions, sufficient for the department to make a BACT determination for each unit." It additionally reiterated that information requested in the June

7

letter remained outstanding. DNR specifically stated that it "again requests that CLCM provide additional information to explain how it proposes to demonstrate compliance with its proposed VOC cap" as would be necessary for CLCM to be classified as a synthetic minor source.

¶19 As the June letter did, the December 14 letter advised that it was "not a complete review" of either the construction permit application or operation permit application and that "[a]dditional information or revisions of the application materials may be needed as the review proceeds." The December 14 letter did not contain any notice of appeal rights.

¶20 After CLCM followed up with a letter, DNR responded with another letter of its own on December 26, 2018. In the December 26 letter, DNR took the position that "a joint meeting between the department, CLCM, the City of St. Francis, and elected officials would not be a productive discussion as the department has not changed its position regarding CLCM's permitting obligations." The December 26 letter also stated that "the department has consistently indicated since June of 2018 that there was reason to believe the facility should have been permitted as a PSD major source since at least 2014" and again requested that CLCM submit the information requested in both the June and December 14 letters.

¶21 On January 11, 2019, CLCM filed a petition for judicial review in the circuit court. In the petition, CLCM requested the court to review the December 14 and December 26

"determinations" that it is subject to PSD standards and permitting requirements.

¶22  DNR moved to dismiss the petition, arguing that the December letters contain only preliminary agency decisions and are thus not subject to judicial review.  It further contended that the final decision on the PSD determination was the June letter, not the December letters, and characterized CLCM's petition as an untimely challenge to the June letter.

¶23  The circuit court agreed with DNR and dismissed the petition.  In reaching its conclusion, the circuit court determined that "as to the Department's designation of CLCM as a major source, clearly and definitively the Department advised the company with the June 26 letter of its determination." Additionally, the circuit court stated with regard to the June letter:  "Clearly and unequivocally the Department stated its position and advised CLCM of its appeal rights and how it could proceed going forward with regard to that determination that they were a major source."  In contrast, the December letters "did not make a final determination . . . that satisfies the Court that a substantial right or interest of the company here, the petitioner, has been conclusively determined."  CLCM moved for reconsideration, which the circuit court denied.

¶24  CLCM appealed, and the court of appeals affirmed the circuit court, determining that "the [December] letters are not final agency decisions subject to judicial review."  Container Life Cycle Mgmt., LLC v. DNR, No. 2019AP1007, unpublished slip op., ¶1 (Wis. Ct. App. Mar. 30, 2021) (per curiam).  After

observing that the permitting process is ongoing, the court of appeals stated that "[e]ven assuming for the sake of argument that a PSD major source designation is immediately subject to judicial review, that designation was not made in the December letter." Id., ¶18. Instead, such a determination arose from the June letter, and "[i]f there was a time to seek judicial review of the PSD major source designation, it was when CLCM received the June letter for which judicial review is no longer available." Id., ¶¶18-19. CLCM petitioned for this court's review.

II

¶25 We are asked to determine whether the December 14 letter issued by DNR is subject to judicial review.[13] Whether an administrative decision is subject to judicial review is a question of law, which we review independently of the determinations rendered by the circuit court and court of appeals. Kimberly Area Sch. Dist. v. LIRC, 2005 WI App 262, ¶9, 288 Wis. 2d 542, 707 N.W.2d 872.

_____

[13] Although CLCM raised the December 26 letter in its petition for judicial review, it did not develop an argument related to the December 26 letter at the court of appeals. Container Life Cycle Mgmt., No. 2019AP1007, at ¶12 n.2. The court of appeals determined that "given that the December 26 letter reiterates the DNR's same position from the December 14 letter, the December 26 letter suffers from the same defects and is not a final agency decision subject to judicial review." Id. Here, CLCM again argues exclusively based on the December 14 letter and we thus need not address the December 26 letter in our analysis. See Sw. Airlines Co. v. DOR, 2021 WI 54, ¶32 n.10, 397 Wis. 2d 431, 960 N.W.2d 384 (explaining that "we generally do not address undeveloped arguments").

10

¶26 In our review, we interpret Wis. Stat. § 227.52. Statutory interpretation likewise presents a question of law this court reviews independently of the determinations of the circuit court and court of appeals. State ex rel. Anderson v. Town of Newbold, 2021 WI 6, ¶13, 395 Wis. 2d 351, 954 N.W.2d 323.

III

¶27 We begin by setting forth the framework for analysis regarding whether an administrative decision is subject to judicial review. Subsequently, we apply that framework to the facts of this case.

A

¶28 Generally, the State is entitled to sovereign immunity and cannot be sued without its consent. PRN Assocs. LLC v. DOA, 2009 WI 53, ¶51, 317 Wis. 2d 656, 766 N.W.2d 559. For purposes of sovereign immunity, a suit against a state agency constitutes a suit against the State. Id. As such, "orders of administrative agencies are not reviewable unless made so by statute." Waste Mgmt. of Wis., Inc. v. DNR, 128 Wis. 2d 59, 87, 381 N.W.2d 318 (1986). If an attempt is made to appeal from a nonappealable order, the court lacks jurisdiction for any purpose, except to dismiss the action. Friends of the Earth v. Pub. Serv. Comm'n, 78 Wis. 2d 388, 404, 254 N.W.2d 299 (1977).

¶29 The applicable statute here is Wis. Stat. § 227.52, which sets forth the general rule regarding the reviewability of administrative agency decisions, as well as several exceptions. As relevant here, § 227.52 states: "Administrative decisions

11

which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review as provided in this chapter . . . ."

¶30  The issue raised in this case implicates what it means for a decision to "adversely affect the substantial interests" of a party.  This case does not represent this court's first dalliance with this phrase or its statutory predecessor.

¶31  In Pasch v. DOR, 58 Wis. 2d 346, 206 N.W.2d 157 (1973), we addressed Wis. Stat. § 227.15 (1973-74), the predecessor statute to § 227.52.  That statute provided that administrative decisions were reviewable if they "directly affect the legal rights, duties or privileges of any person." Id. at 351 (quoting Wis. Stat. § 227.15 (1973-74)).

¶32 Addressing "an order which determined that the commission had the authority to proceed to a hearing and determination upon the merits," id. at 355, the Pasch court concluded that such an order was not subject to judicial review. Specifically, it determined that "[t]he order of the commission finding jurisdiction in the commission to proceed to a hearing upon merits of the controversy does not directly affect the legal rights, duties or privileges of the appellant." Id. at 357.  It characterized the order as "interlocutory" rather than "final" because "the substantial rights of the parties involved in the action remain undetermined and . . . the cause is retained for further action." Id. at 354.

12

¶33 In reaching this determination, the court observed that courts "are averse to review interim steps in an administrative proceeding." Id. (citation omitted). Ultimately, the court set forth:

> The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow.

Id. at 356 (quoting Columbia Broad. Sys. v. United States, 316 U.S. 407, 425 (1942)).

¶34 Two years after Pasch, the legislature amended the subject statute. § 19, ch. 414, Laws of 1975. In doing so, it discarded the "legal rights, duties or privileges" language and utilized verbiage that closely follows that in Pasch: "substantial interests." Id.

¶35 Subsequent cases have consequently continued to look to Pasch for guidance. See, e.g., Waste Mgmt., 128 Wis. 2d at 88-89; Sierra Club v. DNR, 2007 WI App 181, ¶¶13-16, 304 Wis. 2d 614, 736 N.W.2d 918. We do the same here, and emphasize Pasch's indication that although "finality" is a consideration in determining whether "substantial interests" are affected, it is not the sole indicator of reviewability.

¶36 Case law additionally demonstrates that other factors are taken into account in determining whether substantial interests are affected such that an agency action is reviewable. For example, we have stated that generally "[t]he legislative

13

declaration that decisions of administrative agencies be reviewed . . . envisions a review of a decision which must be supported by a record and be based upon findings of fact and conclusions of law." Wis.'s Env't Decade, Inc. v. Pub. Serv. Comm'n, 93 Wis. 2d 650, 658, 287 N.W.2d 737 (1980). In our review, we are guided by the overarching principle that it is the substance of the order, and not its form or label, that is the focus. Sierra Club, 304 Wis. 2d 614, ¶14.

B

¶37 With this background and framework of analysis in hand, we focus our review on the December 14 letter. CLCM asserts that the December 14 letter is amenable to judicial review because it adversely affects CLCM's substantial interests in that the letter subjects CLCM to more burdensome PSD permitting requirements.[14]

¶38 In contrast, DNR contends that judicial review is available for those agency decisions that conclusively determine legal rights only, and not for preliminary determinations in an ongoing permitting process. In DNR's view, the December 14 letter did not conclusively determine any of CLCM's substantial interests, and the petition for judicial review of the December

---

[14] CLCM additionally argues that past cases have instituted a "finality" requirement for review of administrative decisions, and that there is no basis for such a requirement in the text of Wis. Stat. § 227.52. As set forth above, existing precedent indicates that there is no such "finality" requirement and we need not address this argument further.

14

14 letter is really an untimely attempt to challenge the PSD determination made in the June letter.

¶39 We agree with DNR that the December 14 letter does not affect CLCM's substantial interests. As a result, the letter is not subject to judicial review and the circuit court properly dismissed CLCM's petition.

¶40 Like the order at issue in Pasch, the December 14 letter is unreviewable because "the substantial rights of the parties involved in the action remain undetermined and . . . the cause is retained for further action." Pasch, 58 Wis. 2d at 354. The letter itself emphasized that it "is not a complete review" of the permit applications at issue.

¶41 It further advised that DNR considered CLCM's application to be incomplete and requested additional information to remedy the defects. This is another indication of an ongoing review where the "cause is retained for further action" by the agency. Rather than "a decision . . . supported by a record and . . . based upon findings of fact and conclusions of law," Wis.'s Env't Decade, 93 Wis. 2d at 658, the letter indicates that it is seeking information to build such a record. Additionally, although not dispositive, we also observe that the December 14 letter did not contain a statement of appeal rights.

¶42 Contrary to CLCM's argument, the December 14 letter did not determine that CLCM's facility is a major source subject

to PSD permitting requirements.[15]   Instead, the December 14 letter merely referenced the June letter:   "In a letter dated June 26, 2018, the department informed CLCM that the St. Francis facility required an after-the-fact PSD permit . . . ." Although the June letter is not a model of clarity, it was in that letter that DNR set forth:   "The department has determined that . . . the facility is a PSD major source."

---

[15] For this reason, the federal cases cited by CLCM are inapposite.  CLCM seeks support in Puerto Rican Cement Co., Inc. v. U.S. Environmental Protection Agency, 889 F.2d 292 (1st Cir. 1989), and Hawaiian Electric Co., Inc. v. U.S. Environmental Protection Agency, 723 F.2d 1440 (9th Cir. 1984).

In Puerto Rican Cement, the petitioner sought a "non-applicability determination" that would allow it to avoid PSD permitting requirements for construction of a new kiln.  Puerto Rican Cement, 889 F.2d at 294.  EPA denied the non-applicability determination and the petitioner sought judicial review.  The First Circuit concluded that EPA's denial of the non-applicability determination was reviewable, stating that "the legal question at issue——the applicability of PSD review——is plainly separable from, and therefore collateral to, all the matters that the agency would consider in a PSD review itself." Id. at 295.

Hawaiian Electric Co. also involved an EPA determination that a new PSD permit was required due to a "major modification."  Hawaiian Elec. Co., 723 F.2d at 1442.  The Ninth Circuit held that such a determination was subject to judicial review.  It reasoned:  "although the application of the major modification definition is an interim step in the PSD permitting process, it has immediate legal consequences, i.e., the requirement of PSD review."  Id.

CLCM contends that these two cases together "stand for the proposition that a decision regarding the applicability of PSD permitting requirements is sufficiently final to warrant judicial review."  However, the December 14 letter made no decision regarding the applicability of PSD permitting requirements.  CLCM's invocation of Puerto Rican Cement and Hawaiian Electric Co. is therefore unpersuasive.

16

¶43 Additionally, the December 14 letter did not conclusively determine that CLCM's facility cannot be a synthetic minor source. Conversely, it requested additional information from CLCM "to explain how it proposes to demonstrate compliance with its proposed VOC cap" as is required for it to be classified as a synthetic minor source. The letter contains no decision regarding whether CLCM qualifies as a synthetic minor source, which makes sense given its request for additional information so it may make such a determination.

¶44 The fact that the December 14 letter requested additional information, leading to a possible increase in CLCM's costs, does not transform it into a reviewable decision. CLCM contends that the practical effect of the December 14 letter is to subject it to costs that it cannot recover if DNR ultimately decides that CLCM is a minor source or synthetic minor source. However, a permit is required for CLCM to do business. Having already notified CLCM of its "determin[ation]" that "the facility is a PSD major source" in the June letter, DNR advising CLCM of the next steps in the December letter resolves nothing regarding CLCM's rights. Instead, it is an indication that the process is ongoing. Thus, a letter indicating that CLCM simply must comply with the process to get a permit, which may accrue some cost to CLCM, does not adversely affect CLCM's substantial interests.

¶45 Our determination that CLCM's substantial interests are not adversely affected is based upon a review of the record and is informed by existing precedent. In Pasch, the appellant

17

argued that the issue should be decided before the appellant was put to the expense of a lengthy proceeding. Pasch, 58 Wis. 2d at 357. In response to this argument the court declined to consider the increased cost that may be placed on the appellant:

> We are mindful of the fact that much time and expense might be saved if the courts would decide at this time that the commission had exceeded its jurisdiction; however, this consideration is outweighed by the resultant delay that would accompany review of these agency determinations and the disruption of the agency's orderly process of adjudication in reaching its ultimate determination.

Id.; see also State v. WERC, 65 Wis. 2d 624, 630-33, 223 N.W.2d 543 (1974); Sierra Club, 304 Wis. 2d 614, ¶16.

¶46 Further, allowing entities to challenge administrative decisions just because the decision would cause the entity to incur substantial costs would create an arbitrary and unworkable system. For example, how much money expended would be enough to secure judicial review? Where would such a line be drawn?

¶47 Reaching the conclusion that CLCM seeks would essentially allow an entity to challenge any decision in the administrative process if it caused them to incur costs. This would greatly expand the world of decisions subject to review and it is hard to imagine an administrative decision that would not be reviewable under such a standard. CLCM's argument would thus lead to an unreasonable result because it would allow parties to challenge virtually any step in the permitting process. See Brown County v. Brown Cnty. Taxpayers Ass'n, 2022

WI 13, ¶29, 400 Wis. 2d 781, 971 N.W.2d 491 (explaining that statutes must be interpreted "to avoid absurd or unreasonable results"). This would be burdensome on courts, agencies, and parties and would significantly delay permitting processes and interrupt business operations.

¶48 U.S. Army Corps of Engineers v. Hawkes Co., Inc., 578 U.S. 590 (2016), cited by CLCM, does not compel a different result. In that case, the U.S. Army Corps of Engineers issued a jurisdictional determination that certain property contained "water of the United States." Id. at 596. Hawkes challenged the determination, and the Corps contended that the revised jurisdictional determination was not a final agency action. Id. at 597.

¶49 The United States Supreme Court disagreed with the Corps. Observing the principles guiding its decision as to whether an agency decision is "final" for purposes of the Administrative Procedure Act,[16] it wrote, "First, the action must mark the consummation of the agency's decisionmaking process——it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. Applying these principles, the Court determined

---

[16] Unlike in Wisconsin, federal courts follow a "finality" requirement when determining reviewability under the federal Administrative Procedure Act. See Bennett v. Spear, 520 U.S. 154, 175 (1997) ("The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court' . . . ."); 5 U.S.C. § 704.

that the jurisdictional determination was sufficiently final to be subject to judicial review:

> [W]hile no administrative or criminal proceeding can be brought for failure to conform to the approved [jurisdictional determination] itself, that final agency determination not only deprives respondents of a five-year safe harbor from liability under the Act, but warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties.

Id. at 600.

¶50 Here, in contrast, the December 14 letter does not subject CLCM to liability as did the jurisdictional determination at issue in Hawkes. As explained above, it is not the consummation of the decisionmaking process but instead is just a step along the way.

¶51 In sum, we conclude that the December 14 letter does not adversely affect CLCM's substantial interests. As a result, the letter is not subject to judicial review and the circuit court properly dismissed CLCM's petition.

¶52 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶53 REBECCA GRASSL BRADLEY, J. *(dissenting).* "The availability of judicial review is the necessary condition, psychologically if not logically, of a system of administrative power which purports to be legitimate, or legally valid." Louis L. Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401 (1958). In accordance with this principle, the legislature has afforded judicial review for "[a]dministrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form," subject to certain exceptions.[1] Wis. Stat. § 227.52 (2019-20). The December 14 decision by the Department of Natural Resources (the Department) to foreclose a particular permitting approach "adversely affect[s]" Container Life Cycle Management, Inc.'s (CLCM) "substantial interests" by forcing CLCM to undergo a more time-consuming, expensive, and burdensome permitting process.

¶54 In reviewing CLCM's challenge, the majority applies a finality requirement despite agreeing the law does not impose one, thereby denying CLCM its statutorily available review. The majority determines nothing in the December 14 letter constitutes a reviewable agency decision, minimizing the letter as merely "a step along the way" in CLCM's permit application process.[2] This is not an accurate representation; the letter

---

[1] Standing to bring the challenge under Wis. Stat. § 227.53(1), a separate threshold for judicial review, is not contested in this case.

[2] Majority op., ¶50.

unequivocally decides a proposed permitting approach "is not approvable." Contrary to the majority's decision, a determination on the availability of a particular permitting process meets the criteria of Wis. Stat. § 227.52. Even applying an express finality requirement, federal courts have deemed this type of determination subject to judicial review. Whether properly applying the plain terms of the statute or improperly applying the precedent developed under its prior language, CLCM is entitled to judicial review of the December 14 determination on the applicability of a permitting approach. Because the majority unlawfully denies CLCM judicial review, I dissent.

## I. BACKGROUND

### A. The Department Letters

¶55 As the majority acknowledges, multiple potential permitting options cover the contaminants at issue; they are outlined in Wis. Admin. Code chs. NR 405, 406, and 407. CLCM argues its facility should be covered by permitting requirements under chapters NR 406 and 407, which apply to natural minor and synthetic minor sources, as opposed to the more burdensome PSD permitting requirements under chapter NR 405, which apply to major sources. Accordingly, CLCM frames its case as resting on which of the "possible permitting regimes" the Department determines governs——one of which is "more costly and protracted."

¶56 CLCM's St. Francis facility was permitted as a minor source since 2015; in 2018, however, the Department told CLCM

2

this permitting classification had been made in error. CLCM submitted a pre-construction air pollution permit application in February 2018 to install a Regenerative Thermal Oxidizer (RTO) for purposes of reducing air emissions, which the Department authorized the next month under an exemption provided in Wis. Admin. Code § NR 406.04(2).[3] On June 7, CLCM submitted a revised air pollution permit application in addition to a commence construction waiver request related to a different project.

¶57 The Department's June 26 letter addressed both applications. The letter denied the commence construction waiver because the Department deemed the facility a major source under Wis. Admin. Code ch. NR 405, which does not allow such waivers. The letter gave notice of the right to appeal this decision. The letter also declared the revised permit application incomplete and requested additional information.

¶58 Among four requests in the June 26 letter, the Department sought information to aid its assessment of whether the facility could be permitted as a synthetic minor source under Wis. Admin. Code ch. NR 407. That request explained:

> The revised construction permit application indicates the facility would like to be a synthetic minor for VOC emissions under ch. NR 407, Wis. Adm. Code. The facility is currently proposing an emission limitation equivalent to 99.5 tons per year. The department is

---

[3] "This section does not provide an exemption from construction permit requirements for a source that is required to obtain a permit under ch. NR 405 [governing Prevention of Significant Deterioration] or 408 [governing construction permits for direct major sources in nonattainment areas] or s. NR 446.03(2)(a) [governing mercury emission limits]." Wis. Admin. Code § NR 406.04.

3

> concerned that the nature of the operations at the facility do not allow for practical enforceability of this proposed limitation. Please explain how the facility can demonstrate compliance with this limitation, given that a significant portion of VOC emissions from the facility are considered fugitive.

The Department expressed "concern[]" that this emissions limitation related to the synthetic minor designation could not be enforced, but requested an explanation on how the facility could comply. Logically, the framing of the Department's inquiry establishes it had not yet determined whether CLCM could obtain the synthetic minor permitting designation; the June 26 letter left that possibility open.

¶59 In response to the June 26 letter, CLCM prepared and submitted additional analyses to the Department on August 9 and September 24, 2018, to show the facility was not a major source. On October 18 and November 12, 2018, the Department met with CLCM regarding the 18-RAB-029 construction permit, during which meeting the Department suggested it could consider as a "possible permitting approach . . . a facility-wide cap on VOC emissions of 40 tons per year (TPY) . . . as a PSD-avoidance limit for the proposed capacity increase for the scrubber-controlled wash processes." CLCM submitted a revised permit application on November 28, seeking approval as a synthetic minor source.

¶60 In contrast to the June 26 letter, the December 14 letter terminated the inquiry into whether the "possible permitting approach discussed during [the November 12, 2018] meeting . . . could be considered as a PSD-avoidance limit for the proposed capacity increase for the scrubber-controlled wash

4

processes." The letter states, "[u]pon further consideration, the department has determined that such a permitting approach is not approvable in an after-the-fact PSD situation." The Department explained it could not approve this permitting approach because it "cannot issue a construction permit for existing equipment for which a facility failed to obtain a PSD permit without placing BACT or BACT-equivalent controls on the equipment in question." The Department concluded "[t]he scrubber-controlled wash processes were clearly modified by construction permit 14-RSG-142 and therefore require BACT or BACT-equivalent controls."[4] In other words, the Department

---

[4] That portion of the letter provided, in full:

On November 12, 2018, DNR staff and representatives of CLCM held a meeting to discuss CLCM's application for construction permit 18-RAB-029. One possible permitting approach discussed during that meeting was whether a facility-wide cap on VOC emissions of 40 tons per year (TPY) could be considered as a PSD-avoidance limit for the proposed capacity increase for the scrubber-controlled wash processes. During this meeting, DNR cautioned CLCM that such a plan was complicated by the unresolved concerns over PSD status of the 2014 project. Upon further consideration, the department has determined that such a permitting approach is not approvable in an after-the-fact PSD situation. In accordance with long-standing US EPA and department policy, DNR cannot issue a construction permit for existing equipment for which a facility failed to obtain a PSD permit without placing BACT or BACT-equivalent controls on the equipment in question. The scrubber-controlled wash processes were clearly modified by construction permit 14-RSG-142 and therefore require BACT or BACT-equivalent controls.

5

concluded CLCM needed to install BACT or BACT-equivalent controls to conduct its refurbishing business. Under these facts, the majority's decision to foreclose statutorily prescribed judicial review is in error.

B. Judicial Review Under Wis. Stat. § 227.52

¶61 In 1943, the legislature created Chapter 227 to govern administrative procedure and review. § 1, ch. 375, Laws of 1943; see also Ralph M. Hoyt, The Wisconsin Administrative Procedure Act, 1944 Wis. L. Rev. 214. As relevant to this case, the Act provided for judicial review of "[a]dministrative decisions in contested cases, whether affirmative or negative in form," subject to certain exceptions. Wis. Stat. § 227.15 (1943-44).[5] The Act defined "[c]ontested case" as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined by decisions or orders addressed to them or disposing of their interests, after opportunity for hearing." Wis. Stat. § 227.01(3) (1943-44). In 1945, the language concerning the "legal rights, duties or privileges" was added directly to the judicial review statute under § 227.15. See § 18, ch. 511, Laws of Wis. 1945.

---

The Department sent another letter on December 26, in which it concluded it "has not changed its position regarding CLCM's permitting obligations or the operation of the [RTO]." The Department emphasized, "With regards to the source status of the facility, the department has consistently indicated since June of 2018 that there was reason to believe the facility should have been permitted as a PSD major source since at least 2014." The Department further requested CLCM submit the required information "to keep the permitting process moving forward."

[5] Wis. Stat. § 227.15 was renumbered to Wis. Stat. § 227.52 in 1986. See 1985 Wis. Act 182, § 35.

¶62 In Pasch v. DOR, 58 Wis. 2d 346, 353, 206 N.W.2d 157 (1973), this court interpreted Wis. Stat. § 227.15 to require finality, a conclusion it grounded in what it perceived to be a "legislative intent . . . to limit judicial review of administrative agency 'decisions' to final orders of the agency." Pasch embraced consequentialist reasoning for its atextual conclusion, emphasizing the "resultant delay that would accompany review of these agency determinations and the disruption of the agency's orderly process of adjudication in reaching its ultimate determination." Id. at 357. A finality requirement is nowhere to be found in the statutory language.

¶63 1976 brought a significant reworking of Wisconsin's Administrative Procedure Act. The legislature replaced the "directly affect the legal rights, duties or privileges" language with the requirement that an administrative decision "adversely affect" "substantial interests." § 19, ch. 414, Laws of 1975. Despite these statutory changes, Wisconsin courts have continued to apply the prior language as construed in Pasch. This case gave the court an opportunity to apply the text of the amended statute, ending our inappropriate reliance on the so-called "legislative intent" supposedly motivating the prior statutory text. The majority takes a pass, perpetuating a misinterpretation of the statutes governing judicial review grounded in the majority's concerns over the consequences of its decision rather than what the law commands.

## II. DISCUSSION

### A. Wis. Stat. § 227.52 Does Not Require Finality

7

¶64 The majority correctly concludes Wis. Stat. § 227.52 does not require finality and accurately recites the statutory standard, which subjects administrative decisions to judicial review if they "adversely affect the substantial interests of any person[.]" Nevertheless, the majority imposes a de facto finality requirement in concluding the Department's decision does not adversely affect CLCM's substantial interests because it "did not conclusively determine that CLCM's facility cannot be a synthetic minor source."[6] In so concluding, the majority smuggles into its analysis the defunct language from an earlier version of the statute and relies on faulty precedent interpreting it.

¶65 The majority maintains "existing precedent indicates that there is no . . . 'finality' requirement."[7] Existing precedent (although wrong) belies the majority's assertion; the court of appeals consistently applies a finality requirement under Wis. Stat. § 227.52. See, e.g., Friends of the Black River Forest v. DNR, 2021 WI App 54, ¶9, 964 N.W.2d 342 ("Although Wis. Stat. § 227.52 does not use the term 'final,' 'case law has established that the legislative intent was to

_____

[6] Majority op., ¶43; see also, id., ¶44 ("[A] letter indicating that CLCM simply must comply with the process to get a permit, which may accrue some cost to CLCM, does not adversely affect CLCM's substantial interests."); id., ¶47 ("CLCM's argument would thus lead to an unreasonable result because it would allow parties to challenge virtually any step in the permitting process. . . . This would be burdensome on courts, agencies, and parties and would significantly delay permitting processes and interrupt business operations.").

[7] Id., ¶37 n.14.

limit judicial review to final [decisions] of [an] agency.'"); Sierra Club v. DNR, 2007 WI App 181, ¶13, 304 Wis. 2d 614, 736 N.W.2d 918) ("Although this statute does not require that an administrative decision be 'final' in order to be subject to judicial review, case law has established that the legislative intent was to limit judicial review to 'final orders of the agency.'"); Kimberly Area Sch. Dist. v. LIRC, 2005 WI App 262, ¶13, 288 Wis. 2d 542, 707 N.W.2d 872 ("Here, the Commission's decision is not final and, therefore, it is not subject to judicial review."); Deering v. LIRC, No. 2011AP803, unpublished slip op., ¶11 (Wis. Ct. App. Mar. 15, 2012) ("While there is no express requirement in these provisions that an agency order must be final in order to be subject to judicial review, case law has established that Wis. Stat. ch. 227 limits judicial review to agency orders that are final. . . . A final order 'directly affects the legal rights, duties, or privileges of a person.'" (quoting Pasch, 58 Wis. 2d at 356)). The majority's refusal to acknowledge the decisive role finality has played in judicial review perpetuates confusion in this area of the law.

¶66 The historical backdrop against which the legislature amended Wis. Stat. § 227.52 confirms the law never required finality and the judiciary imposed it in an inappropriate exercise of judicial policymaking. The period from the 1960s to the 1970s produced "accelerated" change in administrative law. See Bernard Schwartz, Some Recent Administrative Law Trends: Delegations and Judicial Review, 1982 Wis. L. Rev. 208, 209. "By the 1960's, the administrative law issues that were crucial

9

in 1940 seemed as though drawn from another world." Id.; see also Reuel E. Schiller, Enlarging the Administrative Polity: Administrative Law and the Changing Definition of Pluralism, 1945-1970, 53 Vand. L. Rev. 1389 (2000). One commentator suggested "a potent critique of the administrative state that emerged at the beginning of the 1960s" recognized agencies were "arbitrary, inefficient, and inevitably captured by the interests they were supposed to regulate," leading in part to "increased judicial scrutiny of administrative action." Reuel E. Schiller, Rulemaking's Promise: Administrative Law and Legal Culture in the 1960s and 1970s, 53 Admin. L. Rev. 1139, 1142 (2001). In 1971, the D.C. Circuit observed, "We stand on the threshold of a new era in the history of the long and fruitful collaboration of administrative agencies and reviewing courts." Env't Def. Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 597 (D.C. Cir. 1971).

¶67 On the heels of this expanding administrative state and a corresponding increase in scrutiny over its actions, the legislature in 1976 broadened the types of decisions afforded judicial review. See § 19, ch. 414, Laws of 1975. Governor Lucey vetoed the bill implementing these changes——which the legislature overrode——because he was concerned it "enhances the rights of potential litigants against the state," "will increase litigation against the state, the expense of which must be born[e] by all our citizens," and that "the burden on our state's courts, particularly the Supreme Court, will increase." Veto Message of Governor Lucey to 1975 Assembly Bill 163, May

10

28, 1976. The majority assuages the former Governor's concerns——it has no intention of shouldering that burden. Instead, the majority claims opening the door to administrative review based on "substantial costs" would be "absurd" and "would greatly expand the world of decisions subject to review[.]"[8] Expanding the types of decisions subject to review, however, is precisely what the legislature accomplished via its statutory revisions. This court stymies the statute by closing the courthouse doors to litigants seeking relief from financially consequential effects of agency decisions.

¶68 Even under existing precedent imposing a finality requirement, the Department's December 14 decision is reviewable. In Waste Mgmt. of Wis., Inc. v. DNR, 128 Wis. 2d 59, 90, 381 N.W.2d 318 (1986), we concluded our interpretation of Wis. Stat. § 227.15 in Pasch and Wis. Env't Decade, Inc. v. Pub. Serv. Comm'n, 93 Wis. 2d 650, 287 N.W.2d 737 (1980), authorizes "judicial review of agency actions which are final, in the sense that they determine the further legal rights of the person seeking review." Although Waste Mgmt. applies the former statutory language, under its reasoning the December 14 letter qualifies as a reviewable decision even under the stricter "legal rights" framework. In Waste Mgmt., the Department of Natural Resources modified Waste Management's plan of operation at its Omega Hills site by imposing requirements for ground water monitoring, treatment of toxic liquids, and other aspects of the site. Waste Mgmt., 128

---

[8] Id., ¶¶46-47.

11

Wis. 2d at 83. "Notwithstanding the modifications, the approval remained conditioned upon the fulfillment of the requirements." Id. We held § 227.15 "affords Waste Management the right to judicial review of the DNR's decisions to modify requirements contained in the initial approval of the plan of operation for Omega Hills." Id. at 80. We concluded the Department of Natural Resources' modifications to Waste Management's operation plan requirements determined Waste Management's "legal rights" because "[u]nless Waste Management complies with the DNR's requirements, it risks denial, suspension or revocation of its license[.]" Id. at 90. Further, "[a]bsent judicial review . . . , Waste Management faces possible 'irreparable injury' to its interest in its investment, in that it must incur the full costs of compliance regardless of whether the requirements are properly imposed under the [statutory] standards[.]" Id.

¶69 The December 14 determination that the permitting approach "is not approvable" is subject to judicial review under Pasch, Wis. Env't Decade, and Waste Mgmt. because (1) it is a "consummation of the decisionmaking process"[9] with respect to whether CLCM can pursue the proposed permitting approach, forcing CLCM onto a different permitting path with higher costs, increased delays, and greater burdens; (2) it "determine[s] [CLCM's] 'legal rights' because '[u]nless [CLCM] complies with the DNR's [alternative permitting process], it risks denial, suspension, or revocation" of its legal ability to operate; and

_____

[9] Id., ¶50.

12

(3) "[a]bsent judicial review," it will result in "irreparable injury" in the form of imposing the full and unrecoverable costs of complying with the permitting process "regardless of whether the requirements are properly imposed" or the alternative process should have been approved. See Waste Mgmt., 128 Wis. 2d at 90.

B. The December 14 Decision "Adversely Affect[s]" CLCM's "Substantial Interests"

¶70 The December 14 decision "adversely affect[s]" CLCM's "substantial interests," within the meaning of Wis. Stat. § 227.52. As CLCM explained in its petition for judicial review, in the December 14 letter the Department "rescinded its proposal to accept the location-wide cap on VOC emissions, discussed at the November 12th meeting, and requested CLCM provide information required for the [D]epartment to issue a major source permit covering the location." CLCM asserted the "December Determinations represent the culmination of the agency's decision with respect to the applicability of the PSD standards and permitting requirements to the CLCM Location, and directly impacts CLCM's rights going forward with respect to which permitting and enforcement regimes the CLCM Location is subject." CLCM challenged the Department's determination that it "lacks authority under the facts of this case to issue a minor source permit to CLCM restricting emissions to less than 40 [TPY] of VOC emissions."

¶71 Multiple statements in the December 14 letter indicate the Department did not merely reiterate a previous determination or leave all decisions unresolved. First, the letter itself

13

indicates the decision was in response to a meeting held on November 12, 2018——well after the June 26 letter. Second, the Department explained that "[u]pon further consideration," it "determined" the approach (1) "is not approvable," so (2) it "cannot issue a construction permit" for the equipment, and (3) the scrubber-controlled wash processes "therefore require BACT or BACT-equivalent controls." The language of the December 14 letter distinguishes it from the June 26 letter; unlike the Department's ongoing consideration of the issue in June, its determination in December forced CLCM to proceed with a more burdensome permitting process. CLCM could not pursue its chosen course of business without complying with this permitting decision. Even if the Department were to reverse course at some point in the future, CLCM will have incurred sunk costs, unrecoverable from the Department or otherwise.

¶72 CLCM identified specific substantial interests adversely affected by the December 14 letter, which it construed as a "determination that [its] facility must comply with the PSD permitting requirements of chapter NR 405, as opposed to the more flexible and streamlined requirements that apply to 'natural minor' and 'synthetic minor' sources under ch. NR 406 and 407[.]" The determination in the December 14 letter that BACT analyses are required under the more burdensome PSD permitting requirements is a decision independent of the final permit review on the merits; it is instead a threshold question of whether CLCM must conduct the analyses in the first place. CLCM noted this decision "substantially increases the costs and

14

delay associated with permitting" because the required BACT analyses under this permitting regime can take months and involve "$50,000 to $100,000 or more" for a facility. Additionally, the Department's review can cost up to $80,000 and may take more than 18 months before it issues the permit. Once a company has expended the funds required for permitting, these cannot be recouped. The threat of incurring such costs renders the order triggering them judicially reviewable. See Env't Def. Fund, 439 F.2d at 592 ("A threat of economic injury has always been regarded as sufficient . . . for the purpose of finding an order final and reviewable."). The majority's evasive sidestep around perceived line-drawing problems undermines the statutory text and does not make CLCM's interests any less substantial.[10]

¶73 Even federal courts applying an express finality requirement have determined decisions on PSD permitting applicability are reviewable. Despite the majority's acknowledgement that "federal courts follow a 'finality' requirement"[11]——and its insistence that Wisconsin courts do not[12]——the majority reaches a conclusion even more restrictive than under federal law.

¶74 In U.S. Army Corps of Engineers v. Hawkes Co., Inc., the United States Supreme Court concluded an approved jurisdictional determination regarding the discharge of pollutants into "the waters of the United States" was reviewable

---

[10] Id., ¶46.

[11] Id., ¶49 n.16.

[12] Id., ¶37 n.14.

15

because it "clearly 'mark[s] the consummation' of the [U.S. Army] Corps' decisionmaking process on that question." 578 U.S. 590, 597 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)) (emphasis added). The Court reasoned the decision was reviewable because "that final agency determination . . . warns that if [respondents] discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties." Id. at 600. The Court emphasized that "the permitting process can be arduous, expensive, and long." Id. at 601 (citing Rapanos v. United States, 547 U.S. 715, 721 (2006) (plurality op.)). In that case, the respondents "would have to submit numerous assessments of various features of the property, which respondents estimate would cost more than $100,000." Id. at 596.

¶75 In Puerto Rican Cement Co., Inc. v. U.S. Environmental Protection Agency, 889 F.2d 292, 294-95 (1st Cir. 1989), the First Circuit Court of Appeals determined a company's challenge to a decision of the Environmental Protection Agency (EPA) requiring the company to obtain a special kind of EPA approval was ripe for judicial review, notwithstanding the availability of a review process at the agency level. The court reasoned that "to withhold review would work considerable hardship on the Company, forcing it either to abandon its building plans, to compromise them by agreeing to emissions limitations, or to engage in a long, costly PSD review process." Id. at 295. Based on those immediate consequences of the EPA's decision, the

16

court rejected the idea that further proceedings before the EPA rendered judicial review premature:

> [T]he applicability of PSD review . . . is plainly separable from, and therefore collateral to, all the matters that the agency would consider in a PSD review itself. The collateral nature of the issue diminishes the likelihood that further agency proceedings will make it unnecessary for a court to decide the issue[.]

Id. Similarly, in Hawaiian Electric Co., Inc. v. U.S. Environmental Protection Agency, 723 F.2d 1440, 1442 (9th Cir. 1984), the Ninth Circuit determined "the application of the major modification definition is an interim step in the PSD permitting process" subject to judicial review because "it has immediate legal consequences, i.e., the requirement of PSD review." Specifically, the court recognized the company had "an affirmative obligation imposed upon it" and "must take additional affirmative actions in terms of supplying information" to relieve itself of that agency-imposed obligation. Id. at 1443. Additionally, the company was "potentially subject to even more stringent affirmative obligations through the BACT provisions" leaving judicial review "the only feasible route available" to the company "to achieve modification of the requirements presently imposed on it." Id. Accordingly, the court concluded such "intermediate actions are reviewable" by the judiciary "in order to avoid forcing [the company] to comply with a ruling it believes unlawful." Id. at 1444.

¶76 The majority's citation of Hawkes in support of its conclusion that the December 14 letter "is not the consummation

17

of the decisionmaking process but instead is just a step along the way"[13] omits an important qualifier. Under a proper application of Hawkes, the Department's determination is the "'consummation' of . . . [the] decisionmaking process on that question" of which permitting approach applies. Hawkes, 578 U.S. at 597 (emphasis added). Contrary to the majority's characterization of this case, CLCM does not challenge "a step along the way" of a permitting process, but rather a threshold applicability decision. "[O]n that question" of whether CLCM can pursue the permitting approach discussed at the November 12, 2018 meeting, the Department determined the approach "is not approvable." As a result, the Department informed CLCM it would need to provide BACT analyses for that process to legally engage in CLCM's chosen course of business; the costs and delays associated with those analyses "adversely affect" CLCM's "substantial interests." As Puerto Rican Cement, Hawaiian Electric, and Hawkes all illustrate, the threshold decision concerning permitting applicability is distinct from a decision concerning the merits of the permit application; it is a fork in the road preceding any "step along the way." Additionally, that "an earlier judicial review might avoid the expense and inconvenience of further administrative proceedings" is distinct from a collateral decision imposing time-consuming hurdles, costly construction modifications, and substantial permitting costs. See Sierra Club, 304 Wis. 2d 614, ¶16.

---

[13] Id., ¶50.

18

¶77 This case illustrates the risk of allowing administrative goal-post shifting to thwart judicial review. The letters at issue are no paragons of clarity; this case revolves as much around what constitutes the decision as it does whether the decision is reviewable under Wis. Stat. § 227.52. The Department argues the June 26 letter was the final decision that CLCM should have challenged, but this argument ignores the subsequent meetings and letters leaving open the possibility of a PSD-avoidance limit, as well as the notice and appeal referencing only the "construction waiver decision." CLCM argues the December letter contains a reviewable determination. The majority points to the December 14 letter's request for additional information on how CLCM "proposes to demonstrate compliance with its proposed VOC cap,"[14] but in doing so reduces the letter to a notice "indicating that CLCM simply must comply with the process to get a permit[.]"[15] To the extent this request for more information contradicts its decision on the scrubber-controlled wash processes, the Department shifts the goal post and injects administrative uncertainty into the analysis, making judicial review illusive if not altogether unattainable. The broad language of Wis. Stat. § 227.52 does not permit this.

¶78 The majority's erroneous application of the statute governing judicial review of agency decisions would be puzzling but for the majority's transparent revelation of the results-

---

[14] Id., ¶43.

[15] Id., ¶44.

oriented motivations underlying its opinion: the avoidance of what the majority deems to be an "absurd" or "unreasonable result."[16] The majority misapplies the absurd or unreasonable results canon of statutory construction, for at least the second time this term. "It is a misuse of the canon to invoke it as a tool for discarding the plain meaning of an unambiguous statute in favor of an interpretation" the court prefers. Brown County v. Brown Cnty. Taxpayers Ass'n, 2022 WI 13, ¶84, 400 Wis. 2d 781, 971 N.W.2d 491 (Rebecca Grassl Bradley, J., dissenting.).

¶79 Although the absurd or unreasonable results canon applies only rarely and in rather narrow circumstances, many courts cannot resist the temptation to invoke it to justify a preferred outcome. "The absurdity doctrine applies only to textual errors that may be fixed 'by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error.'" Schwab v. Schwab, 2021 WI 67, ¶44 n.1, 397 Wis. 2d 820, 961 N.W.2d 56 (Rebecca Grassl Bradley, J., dissenting) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 238 (2012)); see also State ex rel. Associated Indem. Corp. v. Mortensen, 224 Wis. 398, 272 N.W. 457, 458 (1937) (the absurdity canon "does not . . . justify a court in amending the statute or giving it a meaning to which its language is not susceptible merely to avoid what the court believes are inequitable or unwise results"). "Just because a court dislikes the outcome

---

[16] Id., ¶47.

20

does not mean it is absurd." Schwab, 397 Wis. 2d 820, ¶44 n.1 (Rebecca Grassl Bradley, J., dissenting) (citing Mellen Lumber Co. v. Indus. Comm'n of Wisconsin, 154 Wis. 114, 142 N.W. 187, 189 (1913) ("The statute in question may be inequitable, but this does not make it absurd.")). Misapplication of the canon disturbs the constitutional allocation of power among the branches of government. "If courts ignored the law every time they deem a result unreasonable, the rule of law would be supplanted by the rule of judges." Id.

¶80 Setting aside the impropriety of allowing judicial policy goals to override a statute, the majority's attempt to circumvent an increased burden on the judicial system will ironically produce the opposite effect. Those subject to adverse agency determinations will rush to the courts upon receipt of any communication that could conceivably be construed as a decision, lest the agency and court later deny review of a challenge deemed untimely. The majority's decision in this case will leave regulated entities and individuals uncertain of whether courts will dismiss early challenges as premature or reject later suits as tardy.

### III. CONCLUSION

¶81 Recognizing the power wielded by administrative agencies over the people and entities they regulate, the legislature in 1976 expanded judicial review to include administrative decisions which "adversely affect the substantial interests of any person[.]" Wis. Stat. § 227.52. Flouting this legislative directive, Wisconsin courts continue to keep the

21

courthouse doors shut to regulated entities and individuals alike. The December 14 decision by the Department foreclosing a particular permitting process "adversely affect[s]" CLCM's "substantial interests" because it subjects CLCM to a more costly and time-consuming permitting process, collateral to a merits determination on the permit application itself. Federal courts recognize the impact on a party's "substantial interests" of such a threshold permitting applicability determination, even in the face of an express finality requirement omitted from our judicial review statute.

¶82 Dismissing the impact of the Department's decision on CLCM as "just a step along the way" of the permitting process, the majority misguidedly ignores the adverse effects CLCM will irreparably suffer as a result, and for which Wisconsin law affords CLCM judicial review before the damage is done. The majority misinterprets Wis. Stat. § 227.52 for the express purpose of sparing the courts the burden of ensuring administrative agencies follow the law. In doing so, the majority "leaves Americans at the mercy" of administrative agencies, which have been endowed with "a nearly freestanding coercive power" making the agencies "rulers of a sort unfamiliar in a republic, and the people must jump at their commands." Philip Hamburger, Is Administrative Law Unlawful? 335 (2014). "[T]he judiciary risks the liberty of all citizens if it abdicates its constitutional responsibility to check executive interpretations of the law." Operton v. LIRC, 2017 WI 46, ¶80, 375 Wis. 2d 1, 894 N.W.2d 426 (Rebecca Grassl Bradley, J.,

22

concurring).  Because the majority refuses to serve as a check on the exercise of coercive administrative agency power in this case, I dissent.

¶83  I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.